Submitted on briefs August 5; modified September 19, 1944

# DIMITRE ELECTRIC CO. *v.* PAGET ET AL.

### (151 P. (2d) 630)

Before BAILEY, Chief Justice, and BELT, ROSSMAN, KELLY, LUSK, BRAND and HAY, Associate Justices.

*Arthur H. Lewis,* of Portland, for appellants.

*John D. Damis, Gunther F. Krause,* and *Walter H. Evans, Jr.,* all of Portland, for respondent.

ROSSMAN, J.

This is an appeal by the appellants (defendants), twenty-two in number, from a judgment and decree of the circuit court. The judgment was entered against only one of the defendants-appellants, Greeley Development, Inc. Its amount is $272.53, together with $100 attorney's fee, and $45.25 costs and disbursements. The decree held valid and ordered foreclosed a mechanic's lien claim filed by the plaintiff-respondent in the amount first stated. The lien claim describes ten lots situated in the city of Portland. All of the defendants, according to the decree, possess interests in that property. The main issue is whether or not the mechanic's lien claim is valid.

The property involved in this suit consists of the aforementioned lots and ten dwelling houses constructed upon them. In 1941 the aforementioned Greeley company was the owner, not only of those lots, but

also of ten similar ones situated directly across the street. In that year, all of the lots being vacant, the Greeley company planned the erection of twenty dwelling houses upon them. Later, when the houses were under construction, the plaintiff furnished the electric fixtures for all twenty of them. The latter were built in two series of ten each. The plaintiff's charges for the fixtures which were installed in the first ten houses were paid, with the exception of a balance of $17.05. For the fixtures installed in the second group the plaintiff received nothing. For them it charged $283.13. Besides furnishing the fixtures, the plaintiff made the installations in four of the houses built in the second series. For that labor it charged $29.40, which remains unpaid. For the preparation of its lien claim it paid $5.00, and for its filing $1.25. The attacked judgment is in the total of the first three of the four items just mentioned. The four items constitute the subject-matter of the lien claim. The item of $1.25 was included in the bill of costs and disbursements.

The challenged lien claim describes the ten lots upon which the second series of houses was built. The lots are adjacent to one another, and one house was built upon each of them.

The plaintiff did not file ten lien claims but only one. In attempting to gain lien protection, the plaintiff did not follow its bookkeeping method which entered against each property the value of the fixtures furnished for it, but lumped into a single total the price of all the fixtures and made the total the basis of the single lien claim. Thus the purchaser of one of the ten properties, in order to rid his home of the lien encumbrance, would be compelled to pay, not only for

the fixtures in his own house, but also for the fixtures in the homes of his nine neighbors.

The appellants present nine assignments of error. We deem it necessary to state our disposition of only one of them. The contention upon which it is based is thus expressed in the appellants' brief:

> "Where material or labor and material is furnished under separate contracts relating to different properties, a single lien claim cannot be filed although such properties are contiguous and owned by the same owner."

The respondent's brief says:

> "Only one contract was ever entered into and only one contract was shown in the evidence."

The underlying issue is whether the plaintiff-respondent supplied the electric fixtures under one contract which embraced all of the houses or under a separate contract for each of them.

■ In this state, if labor is performed or material furnished under one contract for two or more buildings located on contiguous lots, a single general mechanic's lien claim may be filed encumbering the entire group of properties; but if the labor was performed or the material furnished under a separate contract for each structure, a separate lien claim must be filed for each property: *Dibblee v. Astoria & Columbia River R. R. Co.*, 57 Or. 428, 111 P. 242, 112 P. 416; *Beach v. Stamper*, 44 Or. 4, 74 P. 208, 102 Am. St. Rep. 597; and *Willamette Mills Co. v. Shea*, 24 Or. 40, 32 P. 759.

The following, we believe, is a fair review of that part of the evidence which indicates whether the plaintiff furnished its materials and performed its

labor under a single contract for all of the twenty houses or under a separate contract for each of them.

The president of the Greeley company was one Tom Cosgrove. The plaintiff was represented in the matters under review by one of its salesmen, C. C. Curry. Since no one who conducted any of the negotiations leading to the purported contract became a witness except Mr. Curry, his testimony is all that is available upon the issue as to whether the fixtures were sold and the installations were made under one contract or more than one. No written memorandum of any feature of the transaction was prepared. Curry testified:

> "One day Mr. Cosgrove said, 'I have a big project coming up, twenty houses. If you can keep your price within twenty or twenty-five dollars I will give you the order for the whole business.' I said, 'We can do it.'"

Curry thought that those words were spoken "somewhere around May, 1941." The plaintiff depends much upon the words just quoted to prove its contention that a contract was effected between itself and the Greeley company, whereby it sold to the latter, by a single transaction, the fixtures for all of the houses. Curry also testified:

> "I began to negotiate this thing long before the property, before the foundations were dug. I looked at the plans and specifications and advised Mr. Cosgrove a number of things to do regarding some of the fixtures, and so forth * * *."

Further, referring to Cosgrove, he testified:

> "Well, he said, 'Now, Curry, this is one of the biggest projects we have ever gotten into and we are going to build twenty houses. If you want the business for the whole of it you can have it if you

can keep the price within twenty to twenty-five dollars.' ''

The kind, size and type of fixtures which Curry and Cosgrove had in mind is nowhere intimated by the record.

Curry, after testifying that the Greeley company had in its employ an electrician who performed its wiring, swore that Cosgrove

"asked me, 'Now suppose that some time we would be up against it and couldn't get those fixtures hung; would you hang them for us?' I said, 'We will; if we don't we could get you somebody who would. We would agree to hang them for you rather than to leave you out in the cold, yes.' ''

The plaintiff relies upon that question and answer to sustain its claim that it contracted to hang whatever fixtures the Greeley company requested.

James Dimitre, president of the plaintiff corporation, who conceded that his participation in the formation of the alleged contract was confined to its approval, expressed the purported agreement thus:

"Well, the agreement that they would buy fixtures for ten houses and they would select the fixtures for each house, that we would build—the fixtures for each house, with the general agreement that they wouldn't exceed twenty-five dollars a house, or thereabouts, and then if they wanted us to install the fixtures we would install them for an additional charge. And also they reserved the right to change the selection to the last minute.

\* \* \*

"Q. But the agreement that you are talking about was originally for twenty houses, not ten?

"A. Twenty houses, in groups of ten, each group separate."

Although it was in May, 1941, according to Curry's recollection, when the purported agreement was effected, no fixtures were delivered until many months later. Curry stated that after a house had been sold,

"Mr. Cosgrove would call me up and say, 'Mrs. Jones just bought house so-and-so. She will be in your store tomorrow at two o'clock. Will you be there to show her fixtures?'"

Curry would then visit the house and, according to his testimony, he would

"make a list of every fixture for the house, living room, dining room, kitchen, bedroom, bathroom; then when Mrs. Jones came in the store to select fixtures I had a sheet already made out, showing what fixtures went in what room and what they were, whether ceiling or bracket or what, and I would say, 'What would you like to have in your living room? Here is the living room fixtures; which one do you like?'"

After the selection had been made, Curry telephoned to Mr. Cosgrove:

"The price on Mrs. Jones' house is so much. Is that all right?" "Yes."

At that point, according to Curry, the fixtures thus selected were packaged and a tag was fastened to the package bearing the number of the house for which the fixtures were selected. Also the appropriate entries were made in the plaintiff's account books. This was the procedure followed in all instances except when the buyer was not sent to the plaintiff's place of business. In such cases Curry himself made the selection. The charges were kept separately in the plaintiff's account books for each house. Concerning that feature, we quote the following from Curry's testimony:

"Q. And charged them to that house?
"A. Yes.

"Q. And each house was kept separately?
"A. We made an invoice for each house.
"Q. A separate charge for each house?
"A. A separate charge for each house.

        \*     \*     \*

"Q. You kept each job separate?
"A. That is right.

        \*     \*     \*

"Q. And they paid for them separately?
"A. That is right."

When the construction of the house had reached the point where it was ready for the installation of the fixtures and the plaintiff was notified to that effect, Curry made the delivery. Concerning that detail, he said:

"When I would deliver fixtures I would always have the white copy of our invoice with me, and if I was fortunate to find the purchaser he always gave me his personal check for the fixtures and I left the white copy as his receipt for having paid the bill."

From the above it will be seen that the purported agreement specified the remuneration to be paid to the plaintiff in terms no more definite than "twenty to twenty-five dollars" for each house. The time of delivery was not mentioned. The kind, type and number of the fixtures likewise were not specified. It is true that Curry mentioned some plans and specifications, but since the individual, who ultimately became the purchaser of one of the houses, made the selection of the fixtures, obviously, the plans and specifications could say nothing definite about their kind. The plans and specifications were not produced at the trial and received no mention except by the words which we quoted in a preceding paragraph.

When the purported agreement was effected, a set of sample fixtures was not selected; nor was the size, type, character or other feature of the fixture specified. The choice of type, kind, price, and so forth was postponed until the construction of the house had progressed to the point where a buyer had been found and he had gone to the plaintiff's showrooms and made a selection. Even then, according to Dimitre, they could be changed "at the last minute." In other words, the conversation of May, 1941, was preliminary in character and was expected to be succeeded by other negotiations which would determine the kind and exact price of the fixtures.

The fluctuating character of the unspecified details is indicated by the fact that one buyer made his selection in January, 1942, while another chose his in the latter part of April. One purchaser was content with fixtures costing only $21.41, but another's selection cost $27.15. Of three houses mentioned by the electrician who installed fixtures, sixteen were placed in one house, while in the other two, fourteen fixtures sufficed.

The question now occurs whether the evidence above reviewed indicates that a single contract was effected under which the fixtures for all twenty houses were furnished, or whether each selection of fixtures, followed by a quotation of their price to Cosgrove and his approval, constituted the contract for that set, to be followed later by the same procedure when Cosgrove had found other purchasers.

■■ The legal principle which governs the issue before us was thus succintly stated by Mr. Justice

RAND, in *Shaw Wholesale Co. v. Hackbarth,* 102 Or. 80, 198 P. 908, 201 P. 1066:

"The offer, however, must be one which is intended of itself to create legal relations on acceptance, and must be capable of creating a definite obligation. It must not be a communication of information as to certain facts which may interest the party to whom it is communicated, or an offer intended merely to open negotiations which may ultimately result in a contract or intended to call forth an offer in legal form from the party to whom it is addressed:  *  *  *."

Section 32, Restatement of the Law, Contracts, says:

"An offer must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain."

The comment which follows those words says:

"Inasmuch as the law of contracts deals only with duties defined by the expressions of the parties, the rule stated in the Section is one of necessity as well as of law. The law cannot subject a person to a contractual duty or give another a contractual right unless the character thereof is fixed by the agreement of the parties. A statement by A that he will pay B what A chooses is no promise."

From Williston on Contracts, Rev. Ed., § 37, we quote:

"It is a necessary requirement in the nature of things that an agreement in order to be binding must be sufficiently definite to enable a court to give it an exact meaning. If an offer contemplates an acceptance by merely an affirmative answer, the offer itself must contain all the terms necessary for the required definiteness.  *  *  *  A lack of definiteness in an agreement may concern the time of performance, the price to be paid, work to be done,  *  *  *. Especially a reservation to either

party of a future untrammelled right to determine the nature of the performance, or a provision that some matter shall be settled by future agreement, has often caused a promise to be too indefinite for enforcement."

In *United Press v. New York Press Co.*, 164 N. Y. 406, 58 N. E. 527, 53 L. R. A. 288, the plaintiff had agreed to deliver to the defendant its news reports, and the defendant had agreed to pay for them "a sum not exceeding three hundred dollars each and every week that said news report is received." In holding that the language just quoted was too indefinite to create a contract, the court said:

"If this were a case where the contract of the parties was merely ambiguous in its terms, it might be permissible to explain them by evidence of their acts, and thus to show a practical construction; but the difficulty with this instrument lies deeper. It lacked support in one of its essential elements,—in the absence of a statement of the price to be paid. That was a defect which was radical in its nature, and which was beyond the reach of oral evidence to supply; for, if the intention of the parties, in so essential a particular, cannot be ascertained from the instrument, neither the court nor the jury will be allowed to make an agreement for them upon the subject. It is elementary in the law that, for the validity of a contract, the promise or the agreement of the parties to it must be certain and explicit, and that their full intention may be ascertained to a reasonable degree of certainty. Their agreement must be neither vague nor indefinite, and, if thus defective, parol proof cannot be resorted to."

It seems clear that if the plaintiff and the Greeley company had fallen into litigation concerning the purported contract, the lack of agreement upon price,

kind and number would have rendered it impossible for any court to have fixed the legal liabilities of the parties. In the absence of agreement upon the particular just mentioned, no court could have measured the damages in the event of a breach of the alleged contract.

■ We are clearly satisfied that the evidence fails to show a single contract requiring the plaintiff to supply fixtures for all of the houses. We are convinced that the conversations which occurred in May of 1941, or thereabouts, were not deemed by Curry and Cosgrove at that time as forming a contract. We believe that the evidence merely shows that Cosgrove, before starting construction of the twenty houses, and before arranging for his mortgage loans, was anxious to know whether electrical fixtures were available at a price of twenty to twenty-five dollars for a house. If the plaintiff could sell at that price, Cosgrove intended to buy from them when the time arrived for making selections. Cosgrove's words, ''If you can keep your price within twenty to twenty-five dollars, I will give you the order for the whole business,'' in our opinion, did not mean that right then and there he contracted to buy twenty sets of fixtures. When those words were spoken, the excavation work had not yet begun. Similar words— equally promissory in character—are frequently employed by people while negotiating a future contractual relationship. In such instances, if the parties contemplate further negotiations for the settling of undetermined terms, the words are deemed mere expressions of intention or of prophecy. In the present instance, the fact that the determination of kind, price and number of fixtures would have to wait until purchasers for the houses had been found and their whims

had been gratified, is a clear indication that Cosgrove's words, "I will give you the order for the whole business," were a mere expression of intention.

In short, we believe that the conversations of 1941 effected no contract. Those conversations were preliminary to contemplated future bargains, contracts or sales. No contract or sale was effected until (1) the Greeley company sent a purchaser of one of the homes to the plaintiff's showrooms; (2) the purchaser selected the fixtures which he desired; (3) Curry quoted over the telephone to Cosgrove the price of the selected fixtures; and (4) Cosgrove expressed his approval. Those were the steps which were actually taken in all instances except when the buyer did not personally select the fixtures. In the one or two exceptions of that kind Curry made the selection, and in those instances steps one and two were omitted. There were twenty sales or contracts—not one.

It follows from the above that the plaintiff was not justified in filing a single lien claim. The attacked lien claim is invalid and confers no rights whatever. The decree of the circuit court which recognized it as valid and ordered its foreclosure is erroneous and must be vacated. A decree should be entered holding the attacked lien claim void.

■ Although we hold that the lien claim is invalid, its invalidity alone cannot affect adversely the judgment rendered in the plaintiff's favor against Greeley Development, Inc. See *Van Lydegraf v. Tyler,* 128 Or. 236, 271 P. 740, 273 P. 719. It will be recalled that the judgment was entered against the Greeley company only. The items which are the bases of the judgment follow: (1) $238.13, the purchase price of the fixtures which the plaintiff sold to the Greeley com-

pany for the second series of ten houses; (2) $29.40, the amount which the plaintiff charged for labor which it furnished upon the Greeley company's request in installing fixtures in four of the houses; (3) $5.00 paid by the Greeley company for the preparation of its lien claim; (4) interest upon $272.53 ($238.13 plus $29.40 plus $5.00) from July 25, 1942, the day when the lien claim was filed; (5) $100.00 attorney's fee awarded for the foreclosure of the lien claim, pursuant to § 67-109, O. C. L. A.; and (6) costs and disbursements amounting to $45.25.

Uncontradicted evidence indicates that the Greeley company ordered the plaintiff to furnish the aforementioned fixtures and perform the installation work previously described. Similar evidence indicates that $238.13 is the price which the Greeley company agreed to pay for the fixtures. Although an assertion is made that the charge for the installation work is excessive to the extent of $12.25, our examination of the record discloses no merit in that contention. The charge of $29.40, in our opinion, is a reasonable one. Clearly, the plaintiff is entitled to judgment against Greeley Development, Inc., for the total of those items. *Van Lydegraf v. Tyler,* supra.

■ The plaintiff, however, is not entitled to have included in its judgment the following items: (1) The amount ($5.00) which it paid for the preparation of the invalid lien claim; (2) interest upon that sum; (3) the amount ($1.25) which it paid for the filing of its lien claim and which was included in its cost bill; (4) the sums paid for the service of process upon any party except the defendant, Greeley Development, Inc.; and (5) the $100.00 attorney's fee allowance.

Modified in the particulars just indicated, we affirm the judgment. The cause is remanded to the circuit

court with instructions to vacate the present decree. A new decree should be entered holding the plaintiff's lien claim invalid and void. The judgment should be modified in the particulars which we have indicated; that is, there should be omitted from it (1) the item of $5.00; (2) interest upon that item; (3) the $100.00 attorney's fee; and from the cost bill there should be omitted the item of $1.25 and disbursements for service upon all parties except the Greeley company.

All of the defendants (appellants) are entitled to the recovery of their costs and disbursements, with the exception of Greeley Development, Inc. The plaintiff is entitled to have included in its judgment against Greeley Development, Inc., all costs and disbursements incurred in both this and the circuit court.