ALASKA CREAMERY PRODUCTS, INC., d/b/a North Star Dairy Products, Appellant,

v.

Joseph WELLS, Philip Scherrer, d/b/a North Star Dairy Distributors, Lavern E. Wells and Ann Scherrer, Appellees.

No. 137.

Supreme Court of Alaska.

July 24, 1962.

---

Peter B. Walton, of Connolly & Walton, Anchorage, for appellant.

S. J. Buckalew, Jr., Anchorage, for appellees.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

AREND, Justice.

This appeal involves a dispute as to the effect of an alleged later agreement between the parties upon their existing sale and distribution contract. More specifically the question raised is this: Was there a later agreement in relation to the existing contract and, if so, was it a novation (substituted contract) or an executory accord which may or may not have been later satisfied?

The undisputed facts are that on April 9, 1959, the appellant, Alaska Creamery Products, Inc., hereinafter referred to as the Creamery, entered into a written sale and distribution contract with the appellees, Joseph Wells and Philip Scherrer, giving them the right to buy the Creamery's dairy products and to sell and distribute them "to any person, firm or organization" in the "Greater Anchorage Area." The appellees covenanted to pay a portion of the Creamery's advertising costs and to diligently solicit and promote its product in the area.[1]

Operations under this contract commenced early in August, 1959, and the first disturbing incident occurred on the following December 16th, when Wells and Scherrer were caught cheating on deliveries by one of their principal customers, Carr's Food Center. Confronted by the owner of Carr's and accused of billing the store for more dairy products than they had delivered there, the appellees admitted the charge and made restitution in the sum of $3,758.76. At the same time Carr's refused to do any more business with them.

---

1. The appellees, Wells and Scherrer, actually entered into separate identical contracts, except that each was given his own territory in the area in which to operate. This is not significant since they more or less pooled their resources and shared their operations under the agreements, using the common business name of North Star Dairy Distributors.

Realizing that by the loss of Carr's Food Center as an outlet they could no longer act effectively as distributors of the Creamery's products, Wells and Scherrer sought out Norman Nelson, president and general manager of the Creamery, at his home on the evening of the 16th, and offered to sell their delivery trucks to the Creamery in consideration that they be released from the sales and distribution contract. There is evidence in the record that Nelson agreed that the Creamery would accept the offer and pay $7,400 for all of the trucks.[2] These negotiations were entirely oral and there was no understanding that they would be reduced to writing.

Wells and Scherrer were anxious to obtain at least $2,000 in cash from the Creamery immediately to apply on their obligation at Carr's; but Nelson informed them that the Creamery had no such ready cash. So it was agreed that Nelson would go to the First National Bank on Monday morning, December 21, to see how much money he could borrow towards the purchase price of the trucks and then to meet the appellees there to complete the Creamery's oral agreement with them.[3] In the meantime, the Creamery was "to go ahead and use the trucks" to make deliveries of its products to stores and homes previously serviced by the appellees.

On Monday morning, December 21, the parties met at the bank as agreed and there the appellees presented to Nelson for the first time an indemnity agreement which they demanded that he sign for the Creamery as a condition to the consummation of their oral agreement to sell the delivery trucks to the Creamery. This indemnity agreement provided, among other things, that the Creamery should hold Wells and Scherrer harmless "for any act or acts which they have committed during their tenure from the date of the issuance of said franchises [their distributor rights under the sale and distribution agreement] to the date hereof." Fearful that other stores might have claims similar to those of Carr's against the appellees, Nelson refused to sign the agreement.[4]

As to what transpired next there is considerable conflict in the record. The appellees testified that in the afternoon of December 21 their attorney, Mr. Buckalew, phoned Nelson and informed him that all his clients wanted was the down payment on the trucks and a note for the balance. They added that no mention of the indemnity agreement was made in this telephone conversation. Nelson insisted that the only other contact he had with the appellees on Monday was when they came to the Creamery in the afternoon. At that time he told them that he would sign the indemnity agreement if Mr. Barrett of the Piggly Wiggly stores,[5] when he returned to Anchorage after Christmas, would assure

2. Nelson testified that he had to "drag" from Wells and Scherrer the story of what had happened at Carr's store; but they both insisted that they volunteered the information to Nelson as soon as they arrived at his home. There is also a conflict in the testimony as to whether it was on the 16th or the 18th day of December that Nelson agreed to buy the trucks.

3. In meetings between Nelson and the appellees on December 18 and 19, preparatory to the meeting planned for December 21 at the bank, the appellees agreed to turn over to the Creamery certain redeemable milk coupons used on home delivery routes, also two ice cream cabinets, a deep freeze, four ice cream packers, three hand trucks, and some route books. In return, the Creamery agreed to and did

pay the appellees $219.60 as the amount owed them for the items mentioned above, after allowing credit to the Creamery for moneys owing to it by the appellees for dairy products and certain advertising. The $219.60 was part of a $500 check given to appellees by Nelson at the time, since "they needed $500 real bad."

4. On cross examination Scherrer insisted that Carr's was the only store that had been overcharged but he gave no convincing reason for including in the written agreement the indemnity clause under consideration.

5. Piggly Wiggly had about seventy per cent of the grocery business in Anchorage and was a major outlet for the Creamery's milk.

the Creamery that his stores had no claims against the appellees. The appellees, according to Nelson, agreed "to go along" and consented to the further use of the trucks by the Creamery. Nelson further stated that the first phone call he received from Attorney Buckalew was on the following Wednesday. Buckalew wanted to know why Nelson did not sign the indemnity agreement and go through with the truck deal. Nelson answered that he did not want to be confronted with a "bunch of lawsuits."

At some time during the night of December 22–23 the appellees surreptitiously removed the delivery trucks from the premises of the Creamery and proceeded to sell them elsewhere, having first transferred title to the trucks to their wives lest the Creamery start suit and attach them. The appellees were fully aware that, without the use of the trucks, the Creamery would be hard-pressed to deliver its products.

The Creamery took the position in its complaint that the negotiations between the parties, commenced on December 16, resulted in an oral agreement of accord and satisfaction whereby the Creamery agreed to release the appellees from the sale and distribution agreement in consideration of their agreement to sell to the Creamery the trucks in question for an agreed price and on agreed terms and to pay to it certain sums owed for dairy products and for advertising costs. The Creamery claimed that the accord and satisfaction was breached by the appellees when they refused to sell the trucks at the agreed price and terms and also refused to pay the sums of money owed to it, and that this breach of the accord by the appellees automatically restored the parties to their original sale and distribution agreement.

Accordingly, the Creamery brought this action for the money it claimed to be owing for dairy products and for advertising and other costs and also to recover damages in the sum of $61,500 for failure of the appellees to perform under both the accord and the original agreement.[6] In their answer the appellees acknowledged the oral accord but denied that they owed any sums of money to the Creamery and denied all allegations as to damages. In addition the appellees prayed for judgment of $11,705.05 against the Creamery on ten separate counterclaims.[7] Any indebtedness to the appellees on their counterclaims was denied by the Creamery in its reply.

The trial court, sitting without a jury, found many of the facts of the case to be substantially as we have set them out above and then specifically found as follows:

"7. * * * At that meeting [of December 16, 1959] the parties entered into an agreement, the terms of which are as follows: (a) The defendants [appellees] agreed to sell to plaintiff [the Creamery] their trucks at their original cost *(being in the neighborhood of $7,400.00),* (b) the plaintiff agreed to release the defendants from the fulfillment or future performance of any obligations under the defendants' distributor's agreements. * * * *When the parties parted that evening they agreed to meet at the First National Bank of Anchorage the following Monday morning in order to consummate the purchase and sale of the trucks, for the plaintiff would then and there learn what funds might be se-*

6. In its complaint the Creamery also asked the court to set aside the conveyances made by the appellees to their wives as being in fraud of creditors, including the Creamery.

7. The counterclaims of the appellees were based upon allegations that the Creamery had (1) breached the original agreement by arbitrarily raising product prices so that the appellees could not compete with their competitors, (2) breached an oral agreement to purchase appellees' trucks, (3) collected accounts receivable belonging to appellees, (4) kept coupons owned by the appellees, (5) feloniously endorsed checks made out to appellees, (6) committed a theft of chattels belonging to appellees, and (7) had become indebted to the appellees for the reasonable value of the use of their trucks.

*cured by way of a bank loan.* The parties never did agree at their evening meeting as to the manner in which the purchase price should be paid; i. e., whether the full purchase price should be paid in cash, or if only a portion thereof in cash, what sum, or the terms according to which the balance should be paid." [Emphasis supplied.]

This finding of fact appears to be the basis for the second conclusion of law entered by the court as follows:

"2. On the evening of December 16, 1959, a novation or compromise agreement was entered into between the plaintiff [the Creamery] and the defendants [appellees], according to the terms of which (a) the plaintiff agreed to purchase from the defendants their trucks for a total purchase price in the neighborhood of $7,400.00, the terms of payment thereof were not fixed; (b) in consideration thereof the plaintiff at that time relinquished and released the defendants from all obligations theretofore incurred by them to the plaintiff under their distributor's

agreements and further released the defendants from the duty to perform in the future any further obligations imposed upon them by their distributor's agreements." [8]

The judgment entered by the court on April 29, 1961, was in favor of the Creamery against the appellees, jointly and severally, for $162.40, plus costs and attorney fees.[9] No mention is made therein of the counterclaim of the appellees. Two days later the court executed and filed a "Satisfaction of Judgment" in the case. The record does not indicate that the Creamery was ever served with notice of the "Satisfaction of Judgment" or consented to the entry thereof.

██ The holding of the trial court that the parties had entered into a novation or compromise agreement was clearly an error of law. For an agreement to be a novation, or substituted contract as it is sometimes designated, there must be present all of the essential elements of an original contract and also an intention that the agreement operate as an immediate dis-

---

8. In accordance with others of its findings the trial court further concluded:

"3. On the following Monday morning, December 21, 1959, the defendants injected into their dealings with the plaintiff a new condition which had previously not been expressed or exacted from the plaintiff, to-wit, that the plaintiff should indemnify them against any possible claims which others might have against the defendants arising out of their prior conduct and performance of said distributor's agreements. At that time the plaintiff refused to fulfill the truck purchase-sale agreement. However, in the afternoon of the same date, if not expressly then at least implicitly, the defendants withdrew the new condition through their attorney's telephone call to the plaintiff.

"4. The plaintiff refused to fulfill the agreement to purchase the defendants' trucks.

"5. Having been released by the plaintiff from the duty to perform their distributor's agreements, the defendants are in no way liable to the plaintiff on account of their failure to continue to distribute

the plaintiff's products; for the same reason the defendants are in no way liable to the plaintiff on account of any debt alleged to have arisen previously under said distributor's agreements.

"6. However, the defendants did expressly acknowledge their debt to the plaintiff in the sum of One Hundred Sixty-Two and 40/100 Dollars ($162.40) and therefore judgment should be entered in favor of the plaintiff against the defendants for the sum of One Hundred Sixty-Two and 40/100 Dollars ($162.40), together with plaintiff's costs herein to be taxed and an attorneys' fee in conformity with the rules of this court.

"7. The defendants are entitled to take nothing by way of their counterclaims.

"8. The conveyances of property from the defendants to their spouses, as detailed in the complaint, should not be set aside."

9. The trial court made a finding that the appellees in their discussions with Nelson acknowledged owing the Creamery $162.-40 for advertising.

charge of the first contract.[10] Any contract to be enforcible must be reasonably definite and certain as to its terms. To be final, the agreement must extend to all the terms which the parties intend to introduce and material terms cannot be left for future settlement.[11] Unless the court has before it ascertainable provisions of an agreement, there is no contract upon which it may act.[12]

In the instant case the parties entered into negotiations on the 16th day of December that the appellees should sell their delivery trucks to the Creamery for a stated price on terms of a cash down payment and the balance to be secured by a note, and in return the Creamery was to release them from their obligations to it under the sale and distribution agreement. The amount of the down payment as well as the terms of the note to be given for the balance of the price were left for future determination by the parties, dependent upon the size of a loan which the Creamery would be able to obtain from the bank on December 21.

Since the total purchase price was not to be payable at the time of the transfer of the trucks to the Creamery but was to be paid on terms, those terms constituted a very material part of the final agreement of the parties. Until those terms are determined and agreed upon there can be no meeting of the minds of the parties; nor is the court free to fix the terms for the parties upon equitable considerations. We have here at best an agreement to agree in the future for the breach of which the law provides no remedy.[13]

Furthermore, we cannot find in the record any evidence to sustain the conclusion of the trial court that the Creamery on December 16 "relinquished and released the defendants [appellees] from all obligations theretofore incurred by them to the plaintiff [the Creamery] under their distributor's agreements and further released the defendants from the duty to perform in the future any further obligations imposed upon them by their distributor's agreements." If there had been evidence in the case of an intention of the parties that their "agreement" of December 16th should operate as an immediate discharge of the sale and distribution agreement, the court, no doubt, would have made a finding to that effect, but it did not.

As a matter of fact, on the point under consideration Nelson testified as follows:

"Q. Did you at any time ever advise the defendants [appellees] that they were excused from their obligations under the [first] contract?

"A. Nope."

Wells testified that Nelson "was going to release" the appellees from the first contract. This is confirmed by the other appellee Scherrer who stated on both di-

10. Crook v. Zorn, 95 F.2d 782 (5th Cir. 1938); O'Reilly v. Johnson, 91 Cal.App. 2d 729, 205 P.2d 716 (1949); Long Tobacco Harvesting Co. v. Brannen, 99 Ga. App. 541, 109 S.E.2d 90, 95 (1959); 6 Corbin, Contracts § 1293, at 188–190, 198–199 (1962); 2 Restatement, Contracts § 424, comment a (1932); 6 Williston, Contracts § 1826, at 5170, § 1865, at 5239 (rev.ed.1938). See also Dorsey v. Tisby, 192 Or. 163, 234 P.2d 557, 560–561 (1951).

11. Putnam v. Cameron, 129 Cal.App.2d 89, 276 P.2d 102, 107 (1954); Reed v. Montgomery, 180 Or. 196, 175 P.2d 986, 995–997 (1947); Dimitre Electric Co. v.

Paget, 175 Or. 72, 151 P.2d 630, 634–635 (1944).

12. California Lettuce Growers, Inc. v. Union Sugar Co., 45 Cal.2d 474, 289 P.2d 785, 790, 49 A.L.R.2d 496 (1955).

13. Beech Aircraft Corp. v. Ross, 155 F.2d 615 (10th Cir.1946); Burgess v. Rodom, 121 Cal.App.2d 71, 262 P.2d 335 (1953); Avalon Products, Inc. v. Lentini, 98 Cal. App.2d 177, 219 P.2d 485 (1950); Shur-On Standard Optical Co. v. Viopake Co., 221 App.Div. 261, 223 N.Y.S. 157 (1927); Bentzen v. H. N. Ranch, Inc., 78 Wyo. 158, 320 P.2d 440, 68 A.L.R.2d 1213 (1958); Annot., 68 A.L.R.2d 1222–1230 (1959).

rect and cross examination that Nelson agreed that "he would relieve us from our distribution agreement." This evidence does not establish the fact of an immediate discharge of the sale and distribution agreement on December 16th as concluded by the trial court, or at any time after the 16th.[14]

Since the negotiations between the parties, commenced on December 16, did not result in a novation, can it be said that they constituted an executory accord? In their pleadings both parties refer to these negotiations as "an oral agreement of accord and satisfaction." However, in its brief the Creamery argues that, if there was any kind of agreement entered into between the parties, it was an executory accord which never became an accord and satisfaction because the appellees failed to perform their obligation under the accord when they refused on December 21 to transfer the trucks without the execution of a written indemnity agreement by the Creamery.

The appellees likewise are willing to assume that the oral "agreement" was an executory accord and that they repudiated their obligation thereunder. But they contend that their repudiation was only an anticipatory breach which they withdrew through their attorney in the afternoon of December 21 thereby reinstating their rights under the accord. Then they charge that the Creamery thereafter breached the accord by refusing to pay for the trucks.

All of this begs the simple question: Did the parties ever enter into an enforcible oral agreement?

Professor Corbin says of an executory accord that it is

" * * * an agreement that an existing claim shall be discharged in the future by the rendition of a substituted performance. The reason that such an agreement is not in itself at once operative as a discharge of the claim is that the agreement itself does not so provide. If it does so provide, it operates accordingly and is a substituted contract [novation]. * * * There is unlimited authority to the effect that an accord executory, providing for a future discharge of a claim, is not itself a present discharge." [15]

An executory accord, being an agreement or contract, must contain all of the essential elements of an original contract just as we have pointed out in the case of a novation. It, too, requires a meeting of the minds of the parties upon a proper subject.[16] The whole matter is summed up in the California case of Ayoob v. Ayoob [17] wherein it was held:

" * * * the deficiency of proof of a novation would likewise result in a failure to establish the existence of an accord and satisfaction, since the essential elements of a contract must be present in either case. * * *"

We conclude that the parties never did enter into an enforcible agreement, either as a novation, executory accord, or accord and satisfaction, by their negotiations commenced on December 16 and, therefore, the sale and distribution agreement remains a valid and subsisting obligation between them and they are bound by its terms.

14. The appellees in their brief make the conclusionary and unhelpful statement that " * * * a careful reading of the transcript could lead to the reasonable conclusion that the appellees had been released" from the first contract.

15. 6 Corbin, Contracts § 1269, at 75–76 (1962).

16. Puget Sound Pulp and Timber Co. v. O'Reilly, 239 F.2d 607, 610 (9th Cir. 1956); Fleming v. Cooper, 225 Ark. 634, 284 S.W.2d 857, 861–862, 58 A.L.R.2d 694 (1955); Whepley Oil Co. v. Associated Oil Co., 6 Cal.App.2d 94, 44 P.2d 670, 677 (1935); State v. Funk, 105 Or. 134, 199 P. 592, 209 P. 113, 117, 25 A.L.R. 625 (1922).

17. 74 Cal.App.2d 236, 168 P.2d 462 472 (1946).

In the present state of the record we are unable to determine the respective rights of the parties under the original contract and so, for the errors pointed out, the judgment will be reversed and the case remanded for a new trial, limited to determining those rights. Since the case will have to be retried, we deem it unnecessary to pass upon other points raised in the appeal.

Reversed and remanded.