Sidney M. HORMAN individually, and as partner in Horman Construction Company, a Utah corporation, **Plaintiffs and Respondents,**

v.

Rodney F. GORDON, Frank A. Nelson, Jr.,

v.

Jim P. HANSEN, and J.O. Kingston, **Defendants and Appellants.**

No. 860017-CA.

Court of Appeals of Utah.

Aug. 11, 1987.

---

John G. Marshall, Marshall and Willis, Salt Lake City, for defendants and appellants.

Raymond A. Hintze, Walker, Hintze & Brown, Salt Lake City, for plaintiffs and respondents.

Before BENCH, DAVIDSON and GARFF, JJ.

## OPINION

GARFF, Judge:

Defendants Rodney F. Gordon, Frank A. Nelson, and Jim P. Hansen appeal from the trial court's entry of judgment in favor of plaintiff Sidney M. Horman, seeking an order adjusting the amount of the judgment entered against them jointly. Defendant Gordon also seeks a reversal of the judgment entered against him personally.

This appeal arises from a series of promissory notes executed by Gordon, Nelson, and Hansen in favor of Horman. Gordon, Nelson, and Hansen were principals in Ecotek, a now defunct business consulting and management firm, and in Bonneville Development Corporation. These two firms had interests in the Sherwood Shopping Center in Ogden, Utah, and in the Ramada Inn in Evanston, Wyoming. A third party, J.O. Kingston, was a principal in Bonneville Development Corporation, but was not involved in Ecotek.

On May 22, 1974, Horman, to help Ecotek out of financial difficulties, cosigned a $20,000 note (# 1) to Walker Bank and Trust as a favor for Gordon. Because Ecotek received the $20,000 proceeds, Gordon, on behalf of Ecotek, signed a promissory note for the debt in Horman's favor. Horman made all payments to the bank on the note, and was never repaid by Ecotek.

Horman again cosigned a note for Gordon in the interest of Ecotek on December 31, 1974 (# 2). This note was for $7,200 in favor of Zion's First National Bank. Again, Horman paid the note when it became due, and Gordon made no payments on it. After Horman paid off the note, Zions assigned it to him so that he could collect the amount from Gordon.

During this time, Horman sold his personal residence to Gordon, Hansen, and Ecotek in exchange for a $135,000 promissory note (# 3). Horman did not take a mortgage against the home as security on the note, but, instead, took a mortgage against the Sherwood Shopping Center in Ogden and the Ramada Inn in Evanston.

On March 3, 1975, Horman loaned Gordon $2,200 on a personal promissory note (# 4). Gordon never repaid this note.

On March 8, 1975, Ecotek was again in need of money, so Horman loaned Gordon $32,100 memorialized by Gordon's personal note (# 5). Gordon never repaid this note.

On December 15, 1975, Kingston purchased the Sherwood Shopping Center property from Ecotek. In connection with this purchase, he assumed three notes owed by Gordon to Horman: the December 31, 1974 note for $7,200 (# 2), the March 3, 1975 note for $2,200 (# 4), and the March 8, 1975 note for $32,100 (# 5). Regarding this assumption, Horman testified that he had never agreed with Gordon to permit Kingston to assume the three notes, Gordon had never asked him to release these notes, and, in fact, he had never released Gordon from the notes.

In connection with his purchase of the Sherwood Shopping Center property, Kingston also signed a note to Ecotek for $75,000 (# 6) which Horman later purchased from Ecotek for $50,000.

In 1976, Ecotek incurred another obligation to Horman for $15,000 (# 7). This debt was never repaid.

On February 24, 1977, Gordon, Nelson, Hansen, and Kingston executed a note in favor of Horman for $38,594.66 (# 8) as partial payment for a building which Horman owned in Murray, Utah, and had sold to Ecotek. Horman received no payments on this note.

On April 1, 1977, Gordon again wished to borrow money from Horman. As a condition for loaning Gordon more money, Horman insisted that Gordon prepare a list of all outstanding notes he owed to Horman and the balances due on each, and reaffirm

them by signing the list. Upon Gordon's compliance, Horman loaned $200,000 to Gordon, Nelson, Hansen, and Kingston on a promissory note dated April 8, 1977 (# 9). Principal was repaid on this note but interest was not.

In July 1981, Horman became concerned about the parties' failure to repay the loans and threatened to sue. Consequently, on July 30, 1981, Gordon, Nelson, and Hansen executed a new, unsecured note (# 10) for $120,895.32 in Horman's favor to consolidate the amounts due on three of the previous notes: the 1976 note for $15,000 (# 7), the February 24, 1977 note for $38,-594.66 (# 8), and the April 8, 1977 note for $200,000 (# 9). Under the 1976 note (# 7), a total of $22,500 was due, including principal, interest, and attorney's fees. Including interest, $52,537 was due on the February 24, 1977 note (# 8), and only $45,953 remained on the April 8, 1977 note (# 9) because the principal had been paid and only interest remained unpaid. The four previous notes executed by Gordon (# 1, # 2, # 4 & # 5), including the three that had been assumed by Kingston (# 2, # 4 & # 5) were not included in this settlement.

Some time after this meeting, Horman discovered that notes # 1, # 2, # 4 and # 5 had been left out of the consolidated note. His attorney prepared an additional $128,-940.12 note (# 11) which replaced these four notes and included accrued interest. However, Gordon, Nelson, and Hansen refused to sign this note. Kingston, who had assumed three of these notes in writing on December 15, 1975, also refused to pay them. He claimed that he did not owe them because of the parties' negotiations.

During negotiations preceding the signing of the July 30, 1981 note (# 10), the question arose as to whether Kingston should be included as a signatory because he had been a signatory on the February 24, 1977 note for $38,594.66 (# 8), and the April 8, 1977 note for $200,000 (# 9) on which $45,953 interest was due and which had been incorporated into the consolidated note (# 10). In dealing with this question, the parties met to discuss their various obligations. Ecotek and Bonneville owed Kingston $228,000. Kingston, in turn, owed Ecotek $75,000 on the December 15, 1975 note under which he had purchased the Sherwood Shopping Center (# 6). As a result of Ecotek's purchase of Horman's residence for $135,000, Horman had a security interest in the Sherwood property and the Ramada Inn. Because Ecotek had defaulted on this mortgage prior to Kingston's purchase of the property, Horman had a pending foreclosure action at the time of this meeting. Kingston, to avoid foreclosure on the property, agreed to pay off the $135,000 mortgage (# 3) to Horman. He also agreed to pay off the $75,000 note (# 6) he owed to Ecotek, which had been purchased by Horman, directly to Horman. In total, he agreed to pay Horman $210,-000.

Over the next five months, Kingston paid off the $135,000 mortgage (# 3) and the $75,000 note (# 6) as he had agreed to do. In return, he expected Ecotek and its principals to pay the substantial sum of money owed to him, and to relieve him of liability on the debts incorporated into the consolidated note (# 10). In fact, the total amount which he expended in stopping the foreclosure proceedings was $217,033.24, as compared to the $210,000 which he had agreed to pay. In return, on February 24, 1982, Horman, reserving no rights, released any claims against Kingston.

On March 19, 1982, Horman filed suit against Gordon on the notes which Kingston had assumed: the December 31, 1974 note for $7,200 (# 2), the March 3, 1975 note for $2,200 (# 4), and the March 8, 1975 note for $32,100 (# 5). Horman did not attempt to recover these notes from Kingston because of the February 24, 1982 release. On March 25, 1982, Horman filed suit on the July 30, 1981 consolidation note (# 10). These two suits were subsequently combined.

The trial court entered a judgment in Horman's favor, finding that Gordon, Nelson, and Hansen were liable for $120,-895.32 plus 18% interest per annum before judgment on the July 30, 1981 note (# 10), amounting to $175,963.76, plus attorney fees of $26,394.41 and court costs of

$525.05, totalling $202,883.22 plus 18% interest per annum until paid. The court also found that Horman was entitled to judgment against Gordon, personally, for $7,200 plus 13% interest on the December 31, 1974 note (# 2), for $2,200.90 plus the legal rate of interest on the March 3, 1975 note (# 4), and for $32,100 plus 10 to 15% interest (# 5), for a total, including attorney fees, of $109,047.53. However, the court found that Horman was not entitled to judgment on the May 22, 1974 note for $20,000 (# 1) because that note had been executed only by Ecotek, not by the individual defendants.

The following is a summary of this convoluted series of transactions:

No one was liable on the May 22, 1974 note for $20,000 (# 1).[1] Gordon was originally liable on the December 31, 1974 note for $7,200 (# 2), the March 3, 1975 note for $2,200 (# 4), and the March 8, 1975 note for $32,100 (# 5). Kingston assumed them in connection with his purchase of the Sherwood Shopping Center. Horman sued Gordon on these notes and the trial court found Gordon individually liable on them.

Kingston assumed the $135,000 note (# 3) secured by a mortgage in favor of Horman against the Sherwood property and the Ramada Inn in the July 30, 1982 negotiations to settle accounts between the parties. He paid off this obligation.

In connection with his purchase of the Sherwood property, Kingston executed a note in favor of Ecotek for $75,000 (# 6) which Horman later purchased, requiring Gordon and Hansen to endorse it for additional protection. Kingston paid the balance due on this note directly to Horman as a consequence of the July 30, 1982 negotiations.

The 1975 note for $15,000 incurred by Ecotek (# 7), the February 24, 1977 note for $38,594.66 signed by Gordon, Nelson, Hansen, and Kingston (# 8), and the April 8, 1977 note for $200,000 (# 9) signed by Gordon, Nelson, Hansen, and Kingston were never repaid but were incorporated into the July 30, 1982 consolidation note (# 10). Kingston did not sign this note, but assumed other of the parties' obligations instead. (# 3, # 6).

## I

Appellants Gordon, Nelson, and Hansen argue that they should be credited $24,598.83 on the judgment against them on the July 30, 1981 note for $120,895.32 (# 10) because "prior to his release by Horman, Kingston was liable to Horman jointly and severally with these appellants for the full amount of two items which were included in the promissory note in the amount of $120,895.32." They contend that Utah Code Ann. § 15–4–5 (1986)[2] is applicable to Kingston, even though he did not sign the $120,895.32 note, because he remained liable to Horman on the original promissory notes, and, subsequently, was discharged from these obligations by Horman.

We reject this argument and find, instead, that the note for $120,895.32 was a valid merger of the former obligations of the parties, resulting in the discharge of the obligations on which Kingston was liable.

The Second Restatement of Contracts defines a substituted contract as follows:

1. Ecotek had not been joined as a party. Gordon's signature on this note was as a principal of Ecotek and had not bound him individually, and at the time of trial, Ecotek had gone out of business.

2. "If an obligee releasing or discharging an obligor without express reservation of rights against a co-obligor then knows or has reason to know that the obligor released or discharged did not pay as much of the claim as he was bound by his contract or relation with that co-obligor to pay, the obligee's claim against that co-obligor shall be satisfied to the amount which the obligee knew or had reason to know that the released or discharged obligor was bound to such co-obligor to pay.

   If an obligee so releasing or discharging an obligor has not then such knowledge or reason to know, the obligee's claim against the co-obligor shall be satisfied to the extent of the lesser of two amounts, namely: (a) the amount of the fractional share of the obligor released or discharged, or (b) the amount that such obligor was bound by his contract or relation with the co-obligor to pay." Utah Code Ann. § 15–4–5 (1986).

(1) A substituted contract is a contract that is itself accepted by the obligee in satisfaction of the obligor's existing duty.

(2) The substituted contract discharges the original duty and breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty.

Restatement (Second) of Contracts § 279 (1982).

The accompanying comment makes it clear that substitution of a contract which is accepted by the obligee in satisfaction of the original duty discharges the original duty. Restatement (Second) of Contracts § 279 comment a (1982). *See also* 17 Am. Jur.2d *Contracts* § 483 (1964); *Steel v. Eagle*, 207 Kan. 146, 483 P.2d 1063, 1066 (1971).

■ For a substituted contract to be effective, it must be "supported by consideration or some substitute for consideration." Restatement (Second) of Contracts § 279 Comment b (1982); *K–Line Builders, Inc. v. First Fed. Sav. and Loan Assoc.*, 139 Ariz. 209, 677 P.2d 1317, 1321 (1983). Sufficient consideration exists where there is reciprocity.[3]

■ Whether there has been a merger depends upon the intent of the parties. *Haggerty v. Gallatin County*, 717 P.2d 550, 555 (Mont.1986); *Bradshaw v. Burningham*, 671 P.2d 196, 198 (Utah 1983); *Ringwood v. Foreign Auto Works, Inc.* 671 P.2d 182, 183 (Utah 1983). The general rule in Utah is that "one contract will not merge into another unless it is plainly shown that that was the intent of the parties; and this is usually where the later contract fully covers an earlier one...." *Foote v. Taylor*, 635 P.2d 46, 48 (Utah 1981). In determining whether an agreement was intended to supersede a prior agreement, the court may "consider extrin-

sic evidence as to the circumstances of the transaction, including the purpose for which the contested agreement was made." *Ringwood v. Foreign Auto Works, Inc.*, 671 P.2d at 183. Since the issue of whether a contract is integrated is a factual question, the trial court's determination will be sustained on appeal unless clearly erroneous. Utah R.Civ.P. 52.

■ The trial court found that the $120,895.32 note was a "replacement Note for prior obligations of the signators and was given for valid consideration." There appears to be ample evidence to support that finding. The purpose of the July 30, 1982 meeting was to get a full and complete accounting of all the notes owed to Horman by Gordon, Nelson, and Hansen. The record indicates that if the parties reached an agreement, Horman would refrain from foreclosing on the $135,000 mortgage note (# 3) and from suing on the remaining notes. Gordon, Nelson, and Hansen signed the consolidation note (# 10). Both sides suffered a detriment and gained a benefit.

■ That Kingston was not intended to be liable on the note, and that the consolidated note was intended to supersede the prior agreements, is evident from the face of the note. The note incorporated prior agreements of the parties and the only signators were Gordon, Nelson, and Hansen. Kingston's signature does not appear on it, so he cannot be held liable for it, even if the parties had so intended.[4] *See also Johnson v. Coleman*, 288 S.W.2d 348 (Ky. 1956) (A person not named in a written contract cannot be rendered liable on it by a mere intention that he should be bound.)

The circumstances surrounding the signing of the note also indicate that the consolidated note was intended to supersede the prior agreements. Kingston was brought in later in the negotiations between Horman and the defendants to determine

---

**3.** "Each party must gain or lose something by the change. If the benefit or detriment is unilateral, a consideration is lacking, for it is a well-established legal principle that doing or undertaking to do only that which one is already under a legal obligation to do by his contract is no consideration for another's agree-

ment to do what he is not already under a legal obligation to do." 17 Am.Jur.2d *Contracts* § 461 (1964).

**4.** Utah Code Ann. § 70A–3–401(1) (1981): "No person is liable on an instrument unless his signature appears thereon."

whether he should also sign the consolidation note. This meeting between Kingston and the defendants was, according to the defendants' attorney and Horman, a settlement between Kingston and the defendants. Kingston finally agreed to pay the $75,000 note (# 6) and the $135,000 mortgage (# 3) to Horman in return for Gordon's, Nelson's, and Hansen's promise to pay debts owed to him, and in return for their agreement to relieve him of his obligations on the two notes incorporated into the $120,895.32 note.[5] Ecotek's attorney wrote down in his notes that the $120,895.32 agreement cancelled the three prior notes, but did not refer to the $75,000 and $135,000 obligations assumed by Kingston.

■ Because the consolidation note was a substituted contract accepted by Horman in satisfaction of the original obligations, we find that the original duties were discharged, including those of Kingston. Further, because Kingston's signature did not appear on the consolidation note, he cannot be held liable on it. Consequently, Kingston cannot be regarded as a co-obligor on the $120,895.66 consolidation note (# 10).

Gordon, Nelson, and Hansen rely on Utah Code Ann. § 15–4–5 (1986) to support their claim against Kingston. This statute requires that the obligee discharge a co-obligor before other co-obligors may receive credit towards their obligations. Since Kingston is not a co-obligor, this statute is not applicable, and the trial court ruled correctly in holding Gordon, Nelson, and Hansen liable for the entire amount of the $120,895.32 note.

## II

In connection with his purchase from Ecotek of the Sherwood Shopping Center, Kingston assumed three notes owed by Gordon to Horman: the December 31, 1974 note for $7,200 (# 2), the March 3, 1975 note for $2,200 (# 4), and the March 8, 1975 note for $32,100 (# 5). Appellant Gordon argues that, under Utah Code Ann. § 15–4–5 (1982), Horman's release of Kingston also released Gordon because, by this assumption of these obligations, Kingston "became severally obligated to pay them, and Horman knew or had reason to know that Kingston was bound to his co-obligors by his assumption agreement to pay the whole amount, whether or not Horman agreed to the assumption."

In this transaction, defining Gordon's relationship to Kingston and Horman is critical to determining the parties' respective rights. The Restatement of Security § 83 (1941), states that "[t]he suretyship relation is created where the surety ... (c) having been a principal obligor, his obligation, without a novation, has been assumed by another or his property has been transferred under such circumstances as to place the property under the primary burden of the obligation...."

Gordon had been the original obligor on the three notes. These obligations had been assumed by Kingston in connection with his purchase of the Sherwood Shopping Center, and the parties apparently intended that Kingston should assume primary liability for the notes.

■ Further, no novation occurred.[6] For a novation to occur, there must be (1)

5. Regarding the negotiations between these parties, Horman testified that: "Finally they came to the conclusion between themselves that as far as Kingston was concerned, that Kingston would be relieved of the interest on the $200,000.... [S]o then as far as Kingston was concerned, then Rod Gordon and Jim Hansen and Mr. Nelson agreed then that they would relieve him of the $44,000 that they had figured up that was owing and the interest and they would pay that to me." He also testified that "it was understood very well that he [Kingston] was not supposed to sign it because they made an agreement between them that they, meaning Rod Gordon, Jim Hansen, and Frank Nelson, that they would assume the $44,000 of interest on the $200,000 note. And they would also pick up the $38,000 La Rie's note. So they agreed among them. So that was not supposed to be included in this. His signature was not supposed to be included on this note." Hansen also testified that he knew Kingston would not be signing the note.

6. The Restatement (Second) of Contracts defines a novation as "[a] substituted contract that includes as a party one who was neither the obligor nor the obligee of the original duty." Restatement (Second) of Contracts § 280 (1982).

an existing and valid contract, (2) an agreement to the new contract by all parties, (3) a new valid contract, and (4) an extinguishment of the old contract by the new one. *Sims v. Craig*, 96 N.M. 33, 627 P.2d 875, 877 (1981); *Tri–State Oil Tool Indus., Inc. v. EMC Indus., Inc.*, 561 P.2d 714, 715–16 (Wyo.1977); 58 Am.Jur.2d *Novation* § 10 (1971). *See also* Restatement (Second) of Contracts § 280 comments c and d (1982).

■ It is undisputed that the original obligations between Horman and Gordon were valid, and that a new, valid contract was entered into between Kingston and Gordon when Kingston assumed Gordon's obligations to Horman in connection with his purchase of the Sherwood Shopping Center. Horman, however, even though aware of Kingston's assumption of Gordon's debts, never agreed to it and never released Gordon from the obligations, but continued to look to him for payment on the notes. The authorities agree that for novation to take place, all parties must agree, at the time of substitution, that the creditor's consent constituted a discharge of the original obligor. The "[a]ssent of the obligee of the original duty and of the obligor of the new duty is always necessary." Restatement (Second) of Contracts § 280 comment c (1982). The commentator further states that:

> a mere promise by a third party to assume the obligor's duty, not offered in subtitution for that duty, does not result in a novation, and the new duty that the third party may owe to the obligee as an intended beneficiary is in addition to and not in substitution for the obligor's original duty. For novation to take place, the obligee must assent to the discharge of

the obligor's duty in consideration for the promise of the third party to undertake that duty.

Restatement (Second) of Contracts § 280 comment d (1982).

Because the intent of the parties to cause a novation cannot be presumed but must be clear, *Alaska Creamery Prod., Inc. v. Wells*, 373 P.2d 505, 509–10 (Alaska 1962); *Pink v. Busch*, 100 Nev. 684, 691 P.2d 456, 460 (1984); 58 Am.Jur.2d *Novation* § 20 (1971), and because there is no evidence of such intent in the record but only evidence to the contrary, we cannot conclude that a novation occurred. Therefore, all the elements are met for finding that Gordon became secondarily liable to Horman as a surety when Kingston assumed Gordon's obligations under these three notes.[7]

The effect of Gordon's surety relationship on Horman's rights is defined in the Restatement: "Where a person whom the creditor reasonably believes to be a principal is in fact a surety, or where a principal becomes a surety, the creditor is affected by the incidents of suretyship from the time he has knowledge of it." Restatement of Security § 114 (1941). "Notice to the creditor and not actual consent is needed to bind him to the new arrangement." *State v. McKinnon*, 667 P.2d 1239, 1242 n. 4 (Alaska 1983).

■ Horman appears to have believed that Gordon was still a principal because he was still looking to Gordon for payment on the note, and because he had originally been a principal. Even though Horman did not agree to the assumption, it is uncontroverted that he was aware of it prior to his release of Kingston.[8] Thus, he was affect-

---

**7.** The Utah Court, in *Kennedy v. Griffith*, 98 Utah 183, 95 P.2d 752 (1939), found a similar situation to be a surety relationship.

The Court stated:

> Appellants argue that a novation as to the $500 note was effected by their agreements with respondents and Johnson to pay the note. But there was no novation because Johnson, the obligee, did not discharge respondents and accept appellants in their stead, which is an essential element of a novation. (citations omitted). Here was a case where a third party (appellants) agreed to pay the obligation of one party (respondents) to

another (Johnson). The resulting relationship was akin to suretyship with appellants as the principal debtor and respondents as a sort of surety because not released by Johnson. In fact, it was a simple agreement to pay the debt of another.... So far as the relationship between the original debtor and the one who assumed the debt is concerned, the original debtor became surety and the one who assumed the principal." 95 P.2d at 754.

**8.** Included in the exhibits was a list of obligations identified as "notes Owed by Ecotek to Sid Horman assumed by J.O. Kingston." This

ed by the incidents of suretyship and bound by them.[9]

 Under a surety relationship, the creditor is "affected as to his own powers and privileges," and "must especially guard against discharging the surety by dealings with the new principal which alter the principal's obligation...." Restatement of Security § 83, comment on clause (c) (1941). The Restatement states that "[w]here the creditor releases a principal, the surety is discharged, unless (a) the surety consents to remain liable notwithstanding the release, or (b) the creditor in the release reserves his right against surety." Restatement of Security § 122 (1941). *See also MGIC Fin. Corp. v. H.A. Briggs Co.*, 24 Wash.App. 1, 600 P.2d 573, 577 (1979); *See generally* 74 Am.Jur.2d *Suretyship* § 98 (1974). This is true whether or not the surety and principal are bound jointly on the same instrument. Restatement of Security § 122, illustrations 1 and 2 (1941). Gordon did not consent to remain liable notwithstanding the release. Horman, in releasing Kingston, did not expressly reserve his rights against Gordon. Therefore, when Horman released Kingston on February 24, 1982, in return for his payment of $217,033.24, he also released Gordon, as Kingston's surety, from any liability on the notes. *See also* Utah Code Ann. § 15–4–5 (1986).

It is undisputed that Horman, as obligee, did not expressly reserve rights against Gordon when he released Kingston, and that he knew that Kingston had not paid off those particular notes. Therefore, Horman's release of Kingston effected a release of Gordon on the entire amount of the three notes.

exhibit had Horman's handwritten notes on its lower portion.

9. Restatement of Security § 114, comment (a) (1941) states:

[t]he rule stated in this Section not only requires the creditor to recognize a suretyship relation to which he has not consented but its negative inference is a general qualification of rules applicable to the relations of surety and creditor.... Where the creditor deals with two persons as principals although one is from the first, or later becomes, a surety, or

The judgment below is affirmed as to the appellants' liability to Horman on the $120,-895.32 note, but reversed as to Gordon's liability to Horman on the notes assumed by Kingston. Each party to bear its own costs on appeal.

DAVIDSON, J., concurs.

BENCH, J., concurs in the result.

where a single principal becomes a surety by the substitution of a new party as principal as in the case of a mortgagor of land who transfers the land to one who assumes the mortgage debt, the creditor is not bound by the incidents of suretyship until he has knowledge that the supposed principal is or has become a surety. After the creditor knows of the relation of those bound to him, he must take account of the relationship in his dealings with them.