**K & K RECYCLING, INC., Appellant,**

v.

**ALASKA GOLD COMPANY and George W. Seuffert, Sr., Appellees.**

**George W. Seuffert, Sr., Cross–Appellant,**

v.

**K & K Recycling, Inc., Cross–Appellee.**

**Alaska Gold Company, Cross–Appellant,**

v.

**K & K Recycling, Inc., Cross–Appellee.**

Nos. S–10303, S–10323, S–10324.

Supreme Court of Alaska.

Nov. 14, 2003.

Rehearing Denied Dec. 19, 2003.

The Court: All right.

703

Joseph W. Sheehan, Law Offices of Joseph W. Sheehan, Fairbanks, for Appellant/Cross Appellee K & K Recycling, Inc.

Nelson G. Page, Burr, Pease & Kurtz, Anchorage, for Appellee/Cross Appellant Alaska Gold Company.

Stanley T. Lewis, Birch, Horton, Bittner & Cherot, Anchorage, for Appellee/Cross Appellant George W. Seuffert, Sr.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, Chief Justice.

### I. INTRODUCTION

K & K Recycling, Inc. contracted with Alaska Gold Company (AGC) to remove a gold dredge from AGC's land in Chicken. AGC assigned the contract to George Seuffert. After K & K removed the dredge despite alleged interferences by Seuffert, a dispute arose over K & K's entitlement to equipment and facilities in the Old Town of Chicken allegedly associated with the dredge, and a round of summary judgment motions ensued. A second round of summary judgment motions followed concerning the claims in K & K's amended complaint alleging breach of contract and tortious interference by Seuffert and AGC. This appeal involves numerous challenges to the superior court's orders on these summary judgment motions and on a variety of other issues. We reverse the superior court's grant of summary judgment on the issue of the dredge equipment and facilities in the Old Town of Chicken, and we affirm the remainder of the challenged rulings.

### II. FACTS AND PROCEEDINGS

#### A. Factual History

In 1996 Alaska Gold Company started looking into disposing of seven of its gold dredges, considering them to be environmental and personal injury liabilities. AGC's vice-president in charge of lands, Michael Watson, contacted AGC's Fairbanks manager, Pete Eagan, for suggestions on disposing of the dredges. Eagan connected him with K & K Recycling, Inc., a company that recycles property. Although AGC sold six of the

dredges to other parties, AGC and K & K signed a contract on June 25, 1997 concerning the remaining dredge, located on an AGC mining claim in Chicken.

The contract encompassed "all of [AGC's] right, title and interest in and to gold dredge # 4 (the 'Dredge'), together with all attached equipment and related facilities, located on the # 5 Below Discovery placer mining claim in the vicinity of Chicken." K & K agreed to purchase the dredge from AGC for one dollar and to move the dredge from AGC's property within seventeen months. At least ten days prior to moving the dredge, K & K had to provide AGC with a $250,000 surety bond guaranteeing performance and proof of minimum insurance coverage with certain limits and features. Within ten days of K & K's tender, AGC had to give K & K a bill of sale for the dredge.

While AGC was negotiating with K & K, AGC rejected an offer by George W. Seuffert, a retired anesthesiologist who mines gold with his wife Ingrid and son George Jr., to buy AGC's mining claims at Chicken, including the dredge and equipment. About a year later, Seuffert offered a higher price for "all buildings and contents and all mining equipment." Seuffert reached agreement with AGC, and in early March 1998, AGC and Seuffert executed a variety of documents, including a purchase and sale agreement and an assignment from AGC to Seuffert of certain agreements, including the K & K contract. Seuffert's deed conveyed all thirty-eight of AGC's mining claims and "any and all improvements situated thereon." Neither AGC nor Seuffert informed K & K of the assignment.

Shortly thereafter, Seuffert called K & K's owner, Bernie Karl, told him that he had purchased AGC's Chicken claims, and unsuccessfully tried to buy the contract to remove the dredge. In early June 1998, Seuffert asked AGC for a bill of sale for the dredge, which AGC provided. The bill of sale contained a clause stating that Seuffert "assumes all obligations and liabilities respecting the Dredge, including all terms and conditions of that certain agreement ... between [AGC] and [K & K]." It appears that neither AGC nor Seuffert told K & K about the bill of sale.

On June 15, 1998, K & K procured the performance bond required by its contract. AGC Fairbanks manager Eagan told K & K's Karl to send the bond, the insurance, and one dollar to AGC when K & K was ready to move the dredge. Sometime that same month, Seuffert moved his mining camp in front of the dredge, blocking the most obvious route for removing the dredge. Seuffert also blocked the access roads to the dredge with dirt berms.

In July 1998 Seuffert received a letter from an environmental consultant stating that the dredge might contain hazardous materials that could cause contamination if the dredge were dismantled and recommending preparation of an environmental assessment and work plan. Twice that month, Seuffert contacted the Army Corps of Engineers to ask whether the dredge pond would be considered wetlands, whether a permit would be needed if K & K dismantled the dredge, and whether the Corps would exercise jurisdiction over movement of the dredge. In addition, Ingrid Seuffert contacted the Department of Natural Resources to find out what it would do if K & K moved the dredge by cutting down trees to widen a right-of-way.

On July 31, 1998, Karl found that a lock he had placed on the dredge had been removed and that items were missing from the dredge. Karl then had a confrontation with an armed Ingrid Seuffert, who ordered Karl off the property. While leaving, Karl noticed parts and equipment on # 6 Below Discovery, an adjacent claim also known as the "pipe yard," that he believed were associated with the dredge.

Seuffert's attorney, Stanley Lewis, faxed Karl a letter on August 4 charging K & K with trespass, asserting that K & K had no right of entry on the land, and requesting environmental approvals and assessments. The letter declared that Lewis had "reviewed [K & K's] ... agreement with [AGC] (which has been assigned by AGC to Dr. Seuffert)" and concluded that K & K's claim of ownership of the dredge was unfounded. The letter stated that "[r]easonable written requests to enable K & K to perform its contract

obligations will not be denied." Lewis enclosed a copy of Seuffert's bill of sale for the dredge but did not provide a copy of the assignment.

On August 7, 1998, K & K sent AGC the performance bond, an insurance certificate, and a check for one dollar, plus a threat of litigation if the contractual commitments were not met.[1] AGC forwarded this to Seuffert. A few days later, Karl faxed a follow-up letter to AGC requesting a response, advising that K & K had never been informed that AGC sold the dredge and assigned the contract to Seuffert, and declaring that K & K had fulfilled its agreement and expected cooperation.

On August 17 AGC mailed K & K a letter rejecting its tender, telling K & K to tender to Seuffert, and attaching copies of the assignment and bill of sale. On August 18, apparently before receiving this letter, K & K faxed AGC requesting notice of any claimed deficiencies in its tender and declaring that it had no responsibility to, and would not, deal with Seuffert, because K & K's agreement was with AGC.

On August 20 Seuffert faxed K & K a letter from the Corps asserting jurisdiction and prohibiting movement of the dredge without a permit. In late August K & K contacted the Corps to show or confirm that no permit was required. After K & K's contact, the Corps reversed its position. The Department of Natural Resources also ultimately determined that no permit was needed because K & K was not using a government right-of-way.

On August 26 K & K re-tendered by fax to both AGC and Seuffert, including a new certificate of insurance listing both of them as additional insureds. Seuffert notified AGC that he objected to the insurance certificate, the performance bond, and K & K's moving plan. AGC forwarded Seuffert's objections to K & K and told K & K to deal directly with him. On September 2, 1998, K & K provided both a new insurance certificate to meet Seuffert's objections and the Corps letter indicating that no permit was needed. On September 8, following Seuffert's compro-

mise offer to resolve the performance bond issue, K & K agreed to allow title to the dredge to remain in Seuffert's name until the dredge was removed from the property.

On September 9 Seuffert authorized K & K to remove the dredge and its associated equipment and facilities on #5 Below Discovery. The next day, K & K informed Seuffert that it would commence removal operations on September 12. When K & K arrived on September 12 to start moving the dredge, Seuffert had partially removed the berm blocking the access road but had left his camp in front of the dredge. K & K finished the berm removal and asked Seuffert to move his camp as it was blocking the easiest route for removing the dredge, but Seuffert refused. K & K thus had to excavate and backfill a pit and construct a ramp in poor soil, but it successfully removed the dredge from the dredge pond. Once K & K had the dredge moving, Ingrid Seuffert asked their neighbor and lessee Crystal Fagundes–Burns to block K & K from crossing her lease, but she declined. Seuffert then required K & K to build a ramp to cross the Taylor Highway. K & K nonetheless timely moved the dredge, completing the move on October 12. This was twenty days later than K & K's initial estimate, which had been based upon using the easiest route.

Prior to beginning removal operations on September 12, K & K told Seuffert that it believed that not all of the "attached equipment and related facilities" covered by the agreement were on #5 Below Discovery. Seuffert offered to let Karl inspect "the other areas of [his] property" and tag those items to which K & K believed it was entitled. On September 17 Karl and Seuffert walked #5 and #6 Below Discovery together and tagged items. Karl offered to give some of the disputed items to Seuffert, with K & K getting most of the items on #5 Below Discovery and in the "pipe yard"; Seuffert accepted, and they shook hands. K & K began removing the agreed-upon equipment and facilities on October 12, the same day it completed the dredge move. On October 13 Karl discovered items in an old mining camp, the Old Town of Chicken, that he believed went

---

1. K & K maintains that it sent this letter before Karl had read Seuffert's August 4 letter.

with the dredge. After K & K finished removing the agreed-upon items, K & K advised Seuffert that there were items in the Old Town that it wanted. After several unsuccessful attempts to procure the equipment and facilities in the Old Town, K & K proceeded with litigation. K & K conducted a court-authorized inspection of the Old Town in July 1999, discovering property it claimed was associated with the dredge.

### B. Procedural History

In early September 1998, K & K filed a complaint and a motion for a temporary restraining order and preliminary injunction to gain access to remove the dredge. The injunction hearing occurred on September 21 before pro tem Superior Court Judge Raymond M. Funk. By that point, K & K had started removal, so there was no need to consider an injunction. The hearing therefore addressed the moving of the dredge and the agreement between Seuffert and K & K concerning the "pipe yard" equipment.

Following K & K's court-authorized inspection of the Old Town, Seuffert filed a summary judgment motion in August 1999 contending that K & K was not entitled to the Old Town or its contents under its agreement with AGC or, alternatively, that K & K and Seuffert had reached an accord and satisfaction at the injunction hearing whereby K & K released its claim concerning the Old Town and its contents. K & K opposed Seuffert's motion and filed a cross-motion for summary judgment arguing that the contract encompassed the Old Town and its contents and that AGC as an assignor was liable for Seuffert's acts and omissions. On the same day, K & K filed a Rule 56(f) motion seeking to depose the Seufferts and Michael Watson, AGC's former vice-president in charge of lands, if the court denied its cross-motion for summary judgment. Superior Court Judge Niesje J. Steinkruger denied K & K's Rule 56(f) motion.

In October 1999 K & K filed an amended complaint alleging breach of contract, repudiation, breach of the implied covenant of good

faith and fair dealing, interference with contractual relations and prospective economic opportunity, conversion, trespass, and wrongful withholding of property; it also included a claim for punitive damages. Ten days later, AGC opposed K & K's summary judgment motion and filed a motion to dismiss, arguing that the contract was assignable and that the agreement between Seuffert and K & K at the injunction hearing constituted a novation.[2] In November 1999 the court permitted K & K to amend its complaint.

Judge Steinkruger granted Seuffert's motion for summary judgment and denied AGC's motion to dismiss. K & K filed a Rule 77(k) motion for reconsideration because the court had not ruled on its summary judgment motion, because granting Seuffert's motion and denying AGC's was inconsistent, and because K & K discovered additional evidence not previously available. Judge Steinkruger then issued orders granting AGC's motion to dismiss (vacating the previous denial), denying K & K's motion for reconsideration, and denying K & K's motion for summary judgment.

The parties filed a second round of summary judgment motions on the issues raised by K & K's amended complaint. In October and November 2000, Superior Court Judge Raymond M. Funk: (1) granted AGC summary judgment on K & K's claim that AGC's rejection of K & K's tender was a breach of contract; (2) denied all summary judgment motions on K & K's claim that AGC's assignment to Seuffert constituted negligence and a breach of contract; (3) granted AGC and Seuffert summary judgment on K & K's claim that the August 4 letter was a repudiation and material anticipatory breach; (4) denied all summary judgment motions on the claim that Seuffert's contact with government agencies constituted a breach of the implied covenant of good faith and fair dealing; (5) granted AGC and Seuffert summary judgment on the tortious interference claims; (6) denied all parties summary judgment on whether AGC was jointly and severally liable for Seuffert's actions; (7) granted AGC and

---

**2.** AGC addressed the amended complaint claims in its briefing, assuming K & K's motion to amend the complaint would be granted.

Seuffert summary judgment on the claims of conversion, trespass, and wrongful withholding of the Old Town and its contents; and (8) dismissed the punitive damages claim.

K & K's claims for breach of contract and breach of the covenant of good faith and fair dealing went to trial in January 2001. At the end of K & K's case-in-chief, Seuffert moved for a directed verdict on the issue of K & K's damages, claiming that K & K used the disapproved total cost method and failed to prove its case. Judge Funk declined to direct a verdict in Seuffert's favor on this issue. The jury entered a verdict for K & K, finding that Seuffert and AGC breached the contract and the implied covenant of good faith and fair dealing, and that AGC wrongfully assigned the agreement to Seuffert. The jury awarded a total of $123,051 to K & K for Seuffert's and AGC's various actions to impede K & K's ability to remove the dredge: $500 for Seuffert's contact with governmental agencies, $73,530 against AGC and Seuffert for Seuffert's placement of his camp, $1 against AGC and Seuffert for the berm placement, and $49,020 against AGC for the assignment to Seuffert. Judge Funk awarded prejudgment interest accruing from August 7, 1998, when K & K sent its letter containing the threat of litigation. Final judgment was entered against Seuffert and AGC in September 2001.

K & K appeals the court's orders concerning the dredge equipment and facilities in the Old Town and its denial of K & K's Rule 56(f) motion for additional discovery and Rule 77(k) motion to reconsider. K & K also appeals the superior court's denial of its summary judgment motions for breach of contract, repudiation, interference with a contract or prospective economic opportunity, joint and several liability, and conversion/trespass, as well as the court's dismissal of K & K's punitive damages. Finally, K & K challenges three jury instructions on damages.

AGC appeals the court's refusal to enter summary judgment on its claims that the contract was assignable and that the novation meant that AGC was not liable for Seuffert's conduct. AGC also appeals the court's award of attorney's fees to K & K as the prevailing party.

Seuffert appeals the court's denial of his motion for a directed verdict on K & K's method of proving delay damages, its denial of his motion for summary judgment on K & K's claim of breach of the implied covenant of good faith and fair dealing by contacting government agencies, and the applicability to the camp location and berm claims of the court's order that prejudgment interest shall run on all claims from August 7, 1998.

## III. DISCUSSION

### A. The Superior Court Erred in Granting Seuffert Summary Judgment on the Issue of the Equipment and Facilities in the Old Town.

Seuffert's summary judgment motion argued that K & K was not entitled to the Old Town or its contents under its agreement with AGC or, alternatively, that K & K and Seuffert had reached an accord and satisfaction at the injunction hearing whereby K & K released its claim concerning the Old Town and its contents. K & K's summary judgment contended that the contract encompassed "all equipment and facilities associated with the operation of the dredge, regardless of where located on AGC's Chicken claims." The superior court granted Seuffert's motion and denied K & K's, but it is unclear if the court based this decision on contract interpretation or on the accord and satisfaction argument. Because genuine issues of material fact exist, we reverse the grant of summary judgment to Seuffert.

#### 1. Standard of review

■■■ We review orders granting or denying summary judgment de novo.[3] "Drawing all reasonable inferences in favor of the nonmoving party, we will uphold summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law."[4] In particular, a grant of summary judgment based

---

**3.** *Moore v. Allstate Ins. Co.*, 995 P.2d 231, 233 (Alaska 2000).

**4.** *Nichols v. State Farm Fire & Cas. Co.*, 6 P.3d 300, 303 (Alaska 2000).

upon contract interpretation is subject to de novo review because interpretation of contract language is a question of law.[5] The intent of the parties when entering a contract is a question of fact and is thus reviewed under the clearly erroneous standard; summary judgment is improper when the evidence before the superior court establishes a factual dispute as to the intent of the contracting parties.[6]

### 2. Contract interpretation could not support a grant of summary judgment to Seuffert or K & K as to personal property and equipment in the Old Town of Chicken, but the buildings in the Old Town were not included in the contract.

 Seuffert maintains that under K & K's contract with AGC to remove the dredge, K & K was only entitled to "attached equipment and related facilities" located on #5 Below Discovery. K & K counters that the contract includes "facilities associated with the operation of the dredge" in the Old Town and implies that this includes the buildings in the Old Town. In determining a contract's meaning, "[t]he parties' expectations must be gleaned not only from the contract language, but also from extrinsic evidence."[7] The words of the contract are nevertheless the most important evidence of intention.[8]

██ The plain language of the contract states:

AGC agrees ... to sell to K & K all of its right, title and interest in and to gold dredge #4 (the "Dredge"), together with all attached equipment and related facilities, located on the #5 Below Discovery placer mining claim in the vicinity of Chicken, Alaska ... for the sum of One Dollar ($1.00) and other considerations.

K & K focuses on the phrase "together with all attached equipment and related facilities" and argues that while the contract uses the mining claim to identify the location of the

dredge, K & K is entitled to any equipment or facilities "related" to that dredge regardless of location. Indeed, Seuffert conceded at oral argument that dredge parts could be in the Old Town and that a factual issue exists as to whether K & K and AGC intended those items to be part of the sale.

It seems unlikely looking at the contract language that the Old Town itself was included. But Eagan, AGC's Fairbanks agent who was consulted on the contract's wording, testified by affidavit that he advised AGC that the "related facilities" language essentially "encompass[ed] everything on the Chicken claims except for the claims themselves. Clearly every building and all facilities, and all of the equipment on the Chicken claims were there for purposes of supporting the dredging operation, and related directly to the dredging operation." When that language remained in the contract, Eagan concluded that AGC intended the contract to include not only the dredge but also all equipment and facilities in the "pipe yard" and the Old Town. Eagan however did not testify that he conveyed his understanding of the meaning of the related facilities language to Karl before or contemporaneously with the making of the agreement.

Gary Barker, AGC's president who had knowledge of the contract as Watson's supervisor, similarly stated in an affidavit that K & K was entitled to remove the dredge from #5 Below Discovery and to remove dredge parts "from any other area." He maintained, however, that he would not have allowed K & K to remove buildings or other items, except for dredge parts, from the Old Town without a separate contract and further payment.

The affidavits of Eagan and Barker, both of whom were AGC agents at the time, confirm that the contract was meant to include dredge parts wherever they may be located, including in the Old Town, and create a genuine issue of material fact as to whether the contract encompasses other related facili-

---

5. *Am. Computer Inst. v. State*, 995 P.2d 647, 651 (Alaska 2000).

6. *Sykes v. Melba Creek Mining, Inc.*, 952 P.2d 1164, 1167 (Alaska 1998); *Young v. Hobbs*, 916 P.2d 485, 487–88 (Alaska 1996).

7. *Neal & Co. v. Ass'n of Village Council Presidents Reg'l Hous. Auth.*, 895 P.2d 497, 502 (Alaska 1995).

8. *Id.* at 505.

ties in the Old Town. But conduct and admissions of K & K preclude the inclusion of the buildings in the Old Town as "related facilities." When the agreement reflected in the proceedings of September 21, 1998 was negotiated, Karl was aware of the existence of the Old Town yet made no claim to the buildings that are there. In his letter of September 10, 1998, Joseph Sheehan, attorney for K & K, discusses the remaining disagreement over "attached equipment and related facilities." He states in part that "I am further informed that the equipment and related facilities are unique to this dredge and would only fit this dredge. These items should be fairly easy to identify." This description of "equipment and related facilities" plainly excludes the Old Town buildings.

Moreover, sometime before October 16, 1998, Karl walked through the Old Town and identified equipment he thought was associated with the dredge. Richard Haggart, attorney for Seuffert, faxed Sheehan a letter suggesting that now that the dredge was moved as well as all of the materials identified in court, a stipulation dismissing the case would be appropriate. Sheehan faxed back on October 16 as follows:

> In response to your October 15, 1998, correspondence, you are correct, the Dredge move has been completed. As of yet, not all of the equipment and related facilities have been moved. I cannot give you a list of items left to be moved, however, I am told that *there are a number of items, some of which are in the warehouse, blacksmith shop, machine shop, and parts in the vicinity of these buildings.* K & K has not moved any of these items, because Mr. Seuffert was not available when K & K was ready to make the move. K & K has since demobilized for the winter. K & K will complete the movement of the remaining equipment and related facilities as soon as the spring weather permits.
>
> K & K is not prepared to dismiss the pending litigation until all of the property is moved. I will be filing a status report with the court advising my understanding of where we are.

(Emphasis added.) The language of this letter makes it clear that what is in dispute are the items contained within and in the vicinity of these buildings, not the buildings themselves. An affidavit signed by Bernie Karl, president of K & K, dated October 30, 1998, also makes clear that what is in dispute is "a substantial amount of equipment and related facilities located in the warehouse, blacksmith shop, machine shop, and in the vicinity of these buildings" not the buildings themselves. Karl continues in his affidavit:

> Previously, when I had discussions with Mr. Seuffert concerning the equipment and related facilities, no mention was made of the items in the warehouse, blacksmith shop, machine shop, and the vicinity of these buildings. I do not know if Mr. Seuffert is aware of what is in these buildings, or whether he is aware that these items are only usable with the dredge owned by K & K.

On November 9, 1998, Haggart on behalf of Seuffert again inquired of K & K's counsel as to what K & K was "now claiming with respect to 'related equipment and facilities' ":

> I have reviewed the tape of proceedings before Judge Funk on September 21, 1998, and it appears quite clear that the parties placed a settlement on the record stating that all issues relating to identification and division of the "related equipment and facilities" had been resolved. It now appears that K & K is taking the position that additional material is due them under the contract, which would be a change from what was stated in court.
>
> This does not seem appropriate given the fact that K & K presumably had ample opportunity to inspect the property it was buying at the time it negotiated the sale with AGC, it had an opportunity to identify all property claimed prior to the court hearing of September 21st, and the settlement placed on the record in open court clearly specified that the issue had been entirely resolved between the parties.
>
> If we are talking a matter of a few feet of pipe, then obviously Mr. Seuffert is not interested in returning the matter to full scale litigation. If K & K's claims are more extensive, please provide a specification of exactly what is claimed, and why K & K, at this late date, believes it is entitled

to set aside the previous settlement agreement.

Sheehan responded in part:

> Mr. Karl did not mention the equipment located *in* the warehouse, blacksmith shop, machine shop, and *in* the vicinity of those buildings because he was unaware of what was in these buildings. Mr. Seuffert represented that there was no other equipment and related facilities, other than what was in plain view.
>
> As far as an inventory, I do not have one. Perhaps the best way to address this problem is have Seuffert and Karl coordinate a time to meet in Chicken to review and inventory the property. We are open to a suggested date this winter or early spring. Let me know how you want to proceed.

(Emphasis added.) Again, in specific response to Seuffert's counsel's request to identify what K & K was claiming as related equipment and facilities, Sheehan responded that equipment in the buildings was included, and did not list the buildings themselves.

On December 1 Sheehan tentatively suggested that the inspection and inventory take place on April 1, 1999. The meeting did not take place then. But on April 28, 1999, Sheehan wrote Haggart proposing a meeting on May 9 or May 10 "[w]ith respect[ ] to the remaining personal property...." By referring to the outstanding dispute as one concerning "remaining personal property" the claim clearly excluded the Old Town buildings. Similarly, Karl in his affidavit of October 30, 1998, refers to the items that he was still due under the AGC agreement as personal property:

> When I returned in September to move the dredge, it had been broken into and some items of personal property had been removed. I found most of these items of personal property in the dredge warehouse. I do not know who is responsible for this conduct, however, I do know that these items along with a number of other items in the buildings which I have identified, belong to the dredge and can only be used in conjunction with the particular dredge. Other items are associated with the dredge in that they are used as support equipment. By the time I discovered these other items of *personal property* Mr. Seuffert was gone, K & K was already in the process of demobilizing, and winter was setting in. For these reasons I did not move any of these items. My intent is to return in the spring, soon after break-up, to retrieve these items.

(Emphasis added.)

In view of the above, there can be no genuine issue of material fact but that "related facilities" as used in the contract was a reference to personal property and did not include the buildings in Old Town.

Because genuine issues of material fact exist as to which items in the Old Town count as "equipment and related facilities," we conclude that contract interpretation could not support a grant of summary judgment to any of the parties on this issue with respect to personal property. However, conduct and admissions of K & K make clear that the buildings in Old Town were not included in K & K's contract with AGC.

### 3. There was no accord and satisfaction.

 Seuffert also argues that he was entitled to summary judgment because K & K and Seuffert reached an accord and satisfaction at the injunction hearing. "An accord is a contract between a creditor and debtor for a settlement of the creditor's claim by some performance other than that which is due. Satisfaction is the performance of such a contract."[9] An accord and satisfaction discharges the original duty, so any breach of the new duty provides no right of action on the old duty.[10] Antecedent discussions of the accord are ordinarily required to show the existence of an intent to agree on an accord.[11] The burden of demonstrating that material issues of fact exist concerning a party's in-

---

9. *Air Van Lines, Inc. v. Buster,* 673 P.2d 774, 777 (Alaska 1983) (citation omitted); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 281(1) (1981).

10. *Nat'l Bank of Alaska v. Warfle,* 835 P.2d 1167, 1170 (Alaska 1992).

11. *Id.*

tent to enter an accord is a light one; "issues of material fact are easily raised in scrutinizing an alleged accord and satisfaction."[12]

■ Seuffert locates the alleged accord in his disagreement with K & K over the meaning of "attached equipment and related facilities," the walking of the property to tag items, the handshake on the division of items, and the testimony at the hearing as to the nature of the "division agreement." This accord was satisfied, Seuffert states, because K & K removed the agreed-upon items. K & K does not dispute that there was an agreement between Karl and Seuffert as to how the items in the "pipe yard" should be treated, but it deems this irrelevant to its case. K & K notes that the only property issue discussed at the injunction hearing was the "pipe yard" equipment; the equipment and facilities in the Old Town were never mentioned, since Karl had not yet learned of them.

Nothing in the record indicates that the agreement between Seuffert and Karl was meant to settle the whole litigation, create a new contract, or satisfy the contract.[13] The agreement was never put on record as an accord and satisfaction, and Judge Funk, who presided over the hearing and who later presided over the case, was skeptical that an accord and satisfaction had been agreed to at that hearing. Rather, the agreement between K & K and Seuffert apparently was made in an attempt to settle the immediate issue before them, namely ownership of the items in the "pipe yard" and on # 5 Below Discovery.

Because there was no evidence of an intent to supersede the original contract or to settle all issues in the litigation, the superior court's grant of summary judgment cannot be affirmed on the alternative ground of accord and satisfaction.[14] Accordingly, we reverse the superior court's grant of summary judgment to Seuffert on the issue of the dredge equipment and facilities in the Old Town.[15]

**B. The Superior Court Did Not Err in Granting AGC and Seuffert Summary Judgment on K & K's Repudiation Claims.**

■ K & K argues that the August 4 letter from Seuffert's attorney was a repudiation and material anticipatory breach because it made demands that were "inconsistent with the terms of the K & K/AGC agreement." To be a repudiation, "a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform."[16] A repudiation could also involve language that clearly manifests an "intention not to perform except on conditions which go beyond the contract[.]"[17] Similarly, to be an anticipatory breach based on a request for additional conditions, "the request must be coupled with an absolute refusal to perform unless the request is granted."[18]

K & K contends that the letter imposed materially different conditions. For instance, Eagan testified that AGC would not have required the approval of government

12. *Id.* at 1170 n. 6.

13. *See id.* at 1170; *Alaska Creamery Prod., Inc. v. Wells,* 373 P.2d 505, 509–11 (Alaska 1962).

14. Seuffert argues that if K & K did not manifest an intent to create an accord, K & K instead made a unilateral mistake as to a basic assumption on which their agreement was made, that Seuffert was not responsible for K & K's ignorance of the Old Town and its contents, and that the contract allocated the risk of such a mistake to K & K. *See Dickerson v. Williams,* 956 P.2d 458, 466 (Alaska 1998). Seuffert's argument fails, however, because the contract makes no allocation of risk for dredge parts located on other claims and because Seuffert's blocking of the trail to the Old Town with a cable, a gate, and a sign warning trespassers that they will be

"executed" makes him responsible for K & K's failure to inspect that area.

15. Because we are reversing on this issue, we need not address K & K's challenges to the superior court's denial of its Rule 56(f) motion for additional discovery and its Rule 77(k) motion for reconsideration.

16. Restatement (Second) of Contracts § 250 cmt. b (1981); *see also Drake v. Wickwire,* 795 P.2d 195, 198 (Alaska 1990).

17. Restatement (Second) of Contracts § 250 cmt. b (1981).

18. 17A Am.Jur.2d. *Contracts* § 738, at 752 (1991).

agencies, would not have required a written work plan, and would not have considered K & K to be trespassing when it went to inspect the dredge. While Seuffert's letter does appear to impose some new restrictions on access to the dredge, several other "conditions" such as the work plan were phrased merely as requests. Furthermore, Seuffert's request for tender and his statement that "[r]easonable written requests to enable K & K to perform its contract obligations will not be denied" show that the letter did not convey an unequivocal refusal to perform. Accordingly, the court did not err in granting AGC and Seuffert summary judgment on this issue.

■ Similarly, we reject K & K's contention that the court erred in not granting it summary judgment on its claim that Seuffert's relocation of his camp, his placement of a berm on the dredge access road, and his refusal to move his camp all constitute acts of repudiation and thus breach of the contract because they are "[s]tatements and/or acts which add terms and are inconsistent with the terms and performance of the contract." K & K claims Seuffert relocated his camp and refused to move it in order to preclude movement of the dredge, whereas Seuffert claims he had no such intent and that other suitable areas were leased by someone else. Because genuine issues of material fact clearly existed concerning Seuffert's intent in making the camp and berm decisions, the superior court did not err in denying K & K summary judgment. The issue properly went to the jury, who reasonably ruled that Seuffert's camp and berm placements constituted breaches of the contract.

19. K & K also challenges the court's refusal to grant it summary judgment on the question of whether AGC was liable in tort for negligent assignment. K & K agreed just before trial, however, to dismiss this claim without prejudice. As such, we decline to address it.

20. *Odom v. Lee*, 999 P.2d 755, 761 (Alaska 2000).

21. *Id.*

22. *See CSY Liquidating Corp. v. Harris Trust & Sav. Bank*, 162 F.3d 929, 932–33 (7th Cir.1998)

## C. The Superior Court Did Not Err in Granting AGC and Seuffert Summary Judgment on K & K's Tort Claims.

K & K alleged in its amended complaint that Seuffert's actions and AGC's failure to intervene amounted to tortious interference with K & K's contractual rights and prospective business opportunities. K & K also contended that AGC and Seuffert interfered with and precluded K & K's recovery of the dredge, constituting conversion and trespass. K & K further maintained that Seuffert and AGC were wrongfully withholding the Old Town's contents. K & K challenges the court's grant of summary judgment to AGC and Seuffert, and its denial of summary judgment to K & K, on these tort claims.[19] If any of its tort claims survive, K & K also challenges the court's dismissal of its punitive damages claim. We affirm the superior court's rulings.

### 1. Tortious interference with a contract

■ To establish a claim of tortious interference with a contract, a plaintiff must show: (1) an existing contract between it and a third party; (2) defendant's knowledge of the contract and intent to induce a breach; (3) breach; (4) wrongful conduct of the defendant causing the breach; (5) damages; and (6) absence of privilege or justification for the defendant's conduct.[20] A party to a contract cannot be liable for tortiously interfering with that contract.[21] Because AGC is undeniably a party to the contract, this claim cannot lie against AGC. Given that the assignment essentially gave Seuffert the rights of a party, Seuffert was not a true outsider to the contract, and thus this claim also could not lie against him.[22]

("[T]he tort of intentional interference with contract is meant to protect the parties (including third-party beneficiaries, assignees, and others having the rights of parties) to contracts, rather than persons who might be harmed by a breach of someone else's contract.") (citations omitted); *Easton Nissan, Inc. v. Ford Motor Credit Co.*, 755 F.Supp. 671, 674–75 (D.Md.1991) (holding that tort of intentional interference with contractual rights cannot lie against assignee because "subsequent to the assignment, [assignee] was a party to the contracts"); *Douglas Theater Corp. v. Chicago Title & Trust Co.*, 288 Ill.App.3d 880, 224

## 2. Tortious interference with a prospective business opportunity

 To establish a claim for tortious interference with a prospective business opportunity, a plaintiff must show: (1) an existing prospective business relationship between it and a third party; (2) defendant's knowledge of the relationship and intent to prevent its fruition; (3) failure of the prospective relationship to culminate in pecuniary benefit to the plaintiff; (4) conduct of the defendant interfering with the prospective relationship; (5) damages caused by the defendant; and (6) absence of privilege or justification for the defendant's conduct.[23]

 K & K alleges that it had prospective opportunities to market the dredge as a tourist attraction and that Seuffert and AGC knew of and intentionally interfered with these opportunities. The focus of K & K's argument really seems to be that Seuffert's concealment of the equipment and facilities in the Old Town, and Seuffert's and AGC's refusal to recognize K & K's right to them, have precluded K & K from operating the dredge as a tourist attraction because the dredge cannot be operated without those parts. K & K's claim fails, however, because the record contains no evidence of an existing prospective business opportunity with tourists. Karl testified that K & K had not made any commitments to third parties to have the dredge operate as a tourist attraction. There is also no evidence that AGC or Seuffert knew of any such commitment and intended to interfere with it. The court therefore did not err in granting summary judgment to AGC and Seuffert on this claim.

## 3. Conversion, trespass, and wrongful withholding

 "The tort of conversion is 'an intentional exercise of dominion and control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.' "[24] To establish a conversion claim, a plaintiff must prove that it had a possessory interest in the property, that the defendants intentionally interfered with the plaintiff's possession, and that the defendants' acts were the legal cause of the plaintiff's loss of property.[25] Trespass to chattels is essentially conversion but to a lesser degree.[26]

 K & K's allegations are basically that Seuffert and AGC obstructed K & K's removal of the dredge and that Seuffert refused to turn over all of the dredge equipment and facilities. These claims concern contractual breaches and disputes and thus "sound in contract, rather than tort."[27] We have held that "[p]romises set forth in a contract must be enforced by an action on that contract."[28] If K & K's claims could stand, then any contract case involving the transfer of goods or realty would also contain a trespass, conversion, or wrongful withholding claim. But every contract breach cannot be turned into a tort.[29] Furthermore, the consequential damages that would flow from K & K's tort claims and from K & K's contract claims significantly overlap. We therefore affirm the court's grant of summary judgment to AGC and Seuffert on these tort claims.

Ill.Dec. 249, 681 N.E.2d 564, 568 (1997) ("[T]he assignee of a contract should not be subjected to tort liability for a subsequent breach of the assigned contract.... [T]he law governing tortious interference with contract claims ... requires that the tortfeasor be a third party to the contractual relationship.").

23. *Odom v. Fairbanks Mem'l Hosp.*, 999 P.2d 123, 132 (Alaska 2000).

24. *Carver v. Quality Inspection & Testing, Inc.*, 946 P.2d 450, 456 (Alaska 1997) (quoting *Dressel v. Weeks*, 779 P.2d 324, 328 (Alaska 1989)).

25. *Silvers v. Silvers*, 999 P.2d 786, 793 (Alaska 2000).

26. *Mitchell v. Heinrichs*, 27 P.3d 309, 311 n. 1 (Alaska 2001). Trespass to chattels can be committed when a party intentionally dispossesses another of the chattel or intentionally uses or interferes with a chattel in another's possession. RESTATEMENT (SECOND) OF TORTS § 217 (1965).

27. *Kalenka v. Taylor*, 896 P.2d 222, 228 (Alaska 1995).

28. *Alaska Pacific Assur. Co. v. Collins*, 794 P.2d 936, 946 (Alaska 1990).

29. *Id.* ("Only where the duty breached is one imposed by law, such as a traditional tort law duty furthering social policy, may an action between contracting parties sound in tort.").

#### 4. Punitive damages

Because the gravamen of K & K's allegations is in contract, and because none of K & K's tort claims can stand, the superior court did not err in dismissing K & K's punitive damages claim.[30]

### D. The Superior Court Did Not Err in Giving Its Jury Instructions.

■■■■ K & K argues that jury instruction Nos. 34, 35, and 36 are erroneous. Instruction No. 34 deals with methods of calculating damages.[31] Instruction No. 35 concerns K & K's duty to mitigate damages. Instruction No. 36 addresses speculative damages. We review jury instructions de novo and will only consider them grounds for reversal if they were objected to and caused prejudice.[32] If not objected to, we will review jury instructions "only for plain error—that is, for obvious error creating a high likelihood of injustice."[33] "As long as the jury is properly instructed on the law, ... the trial court has broad discretion to determine whether to give instructions specially tailored to the case at hand."[34]

■■■ K & K claims that it did not use the total cost method to calculate damages and that Instruction No. 34 is thus an incorrect statement of the law under this case, misled the jury, and prejudiced K & K.[35] Prior to the drafting of this instruction, K & K argued to the superior court that it did not believe that the total cost method of calculating damages was involved in this case but indicated that the court might have to give an instruction including both actual and total cost instructions, which is what the court did. After it was drafted, the only discussions on the instruction were as follows:

> THE COURT: [W]e've talked about [this instruction] several times, and it sets forth the total [and] actual—finds both to be a jury question, sets forth the four elements.
>
> MR. SHEEHAN: I think you've got a grammatical mistake on the second paragraph, third line. I think that should read "allowed to recover only if K & K."
>
> THE COURT: Right. You mean the "for that" should be deleted.
>
> MR. SHEEHAN: Yeah.
>
> THE COURT: I think so. Got me convinced. Anybody else? Anything else on that one anyone sees?
>
> MR. LEWIS: Okay.
>
> THE COURT: Okay?

The court then turned to the next instruction. Although K & K asserted at oral argument that it did object to Instruction No. 34, our review of the transcript reveals that K &

---

**30.** *See Walt v. State,* 751 P.2d 1345, 1354 (Alaska 1988) ("Since [plaintiff] asserts no recognizable tort claims, his request for punitive damages cannot withstand summary judgment.").

**31.** The total and actual cost methods of calculating damages are discussed below in the section on Seuffert's cross-appeal.

**32.** *State v. Johnson,* 2 P.3d 56, 59 (Alaska 2000); *Conam Alaska v. Bell Lavalin, Inc.,* 842 P.2d 148, 152–53 (Alaska 1992); Alaska R. Civ. P. 51(a).

**33.** *Power Constructors, Inc. v. Taylor & Hintze,* 960 P.2d 20, 29 (Alaska 1998).

**34.** *Id.*

**35.** Instruction No. 34 states:

Damages are to be presented by the best measure that can be used under the circumstances. In this case, damages are to be calculated by showing each element of extra expense included. You must decide if K & K Recycling has done so. If it has, you may compute damages for each extra expense shown.

As to expenses for which K & K Recycling has presented damages evidence only as a portion of total damages, K & K Recycling is allowed to recover only if K & K Recycling proves all four of the following:
1. The nature of the extra moving expenses made it impossible or highly impracticable to determine them with a reasonable degree of accuracy;
2. K & K Recycling's estimate of its expenses for the move of the dredge was realistic;
3. its actual costs were reasonable; and
4. it was not responsible for the added expenses.

If you find that is [sic] has shown all four of these to be more true than not true, you may calculate and award a portion of total damages accordingly.

If it has not proven damages by either of these methods (extra expenses or a portion of total expense), you must award K & K Recycling one dollar ($1.00) in damages.

K did not object to this instruction after it was drafted, apart from asking for a small grammatical correction. We conclude that K & K's failure to adequately object constitutes a waiver of its complaints about the instruction.[36] Furthermore, as explained below, the instruction is also a correct statement of the law.[37] As there was no error or prejudice in giving Instruction No. 34, there are no grounds for reversal.

■ K & K argues that Instruction No. 35 is incorrect because there was no evidence that K & K failed to mitigate and because the evidence was that K & K did mitigate by moving the dredge despite the obstacles created by Seuffert and AGC.[38] The superior court specifically found that there was some evidence of failure to mitigate and allowed the instruction to go to the jury. Because the court's finding is not clearly erroneous, the instruction is a correct statement of the law, and there was no clear prejudice from giving the instruction, we conclude that Instruction No. 35 provides no grounds for reversal.

■ K & K argues that the last paragraph of Instruction No. 36 concerning speculative damages is misleading, and when read with Instruction No. 34 requires an unreasonable burden of proof.[39] K & K maintains that much of its damages are based on two promissory notes and that K &

K was precluded on cross-examination from clarifying the contingency of these notes on the grounds of relevance. K & K contends that it should have been allowed to explain that the reason the dredge was not operating was because of this litigation and because K & K needed the parts, equipment, and facilities in the Old Town to activate the dredge. K & K alleges that based on the wording of Instruction No. 36, the jury concluded that payment of these notes was "not reasonably certain" and that they were not "actual costs" as discussed in Instruction No. 34.

K & K's disagreement is not really with the wording of Instruction No. 36, but rather with the superior court's evidentiary ruling. However, K & K has not raised as a claim of error its evidentiary argument that it should have been allowed to explain the promissory notes' contingency on cross-examination. Furthermore, it is unclear how the giving of this instruction, as distinguished from the court's evidentiary ruling, actually prejudiced K & K. Accordingly, we conclude that Instruction No. 36 also does not constitute grounds for reversal.

### E. AGC's Cross–Appeal Concerning Assignment, Novation, and Attorney's Fees Is Without Merit.

AGC's cross-appeal contends that the superior court should have dismissed all claims

---

**36.** *Sever v. Alaska Pulp Corp.*, 931 P.2d 354, 362 (Alaska 1996); *see also Conam Alaska*, 842 P.2d at 153 (noting "the policy underlying Rule 51(a) that counsel should make a specific objection to a given instruction, even if he has previously argued his position to the court. The trial court needs an identifiable opportunity to rule on a party's position." (quotation omitted)).

**37.** K & K admits that this instruction is "consistent with Alaska law."

**38.** Instruction No. 35 states:
In this case, Mr. Seuffert and Alaska Gold Company claim that, with reasonable efforts and without undue risk, expense, hardship or embarrassment, K & K Recycling could have avoided some or all of the losses claimed even if the losses originally resulted from defendants' failure to keep their promise or their breach of the duty of good faith and fair dealing.
If you decide that it is more likely true than not true that K & K Recycling could have avoided some losses in whole or in part with reasonable efforts and without undue risk, ex-

pense, hardship or embarrassment, you may not require Mr. Seuffert and/or Alaska Gold Company to pay the amount that K & K Recycling reasonably could have avoided and you must subtract any such amount from the amount of damages you have found.
However, if you find that it is more likely true than not true that K & K Recycling incurred costs in making a reasonable effort to avoid such losses, you must make an award to K & K Recycling for such costs.

**39.** Instruction No. 36 states:
If you find in favor of Plaintiff K & K Recycling, but you find that K & K Recycling did not sustain any monetary loss as determined under the previous instructions that I have given you, or that K & K Recycling's loss cannot be determined with reasonable certainty, then you must award K & K Recycling the amount of $1.00.
You are not permitted to include speculative damages, which means compensation for loss or harm that, although possible, is conjectural or not reasonably certain.

against it because the assignment to Seuffert was proper and because the agreement between Seuffert and K & K was a novation. AGC thus challenges the court's denials of its summary judgment motions on the claim that the assignment to Seuffert constituted a breach and the claim that AGC was liable for Seuffert's alleged misconduct. K &· K challenges the court's denial of its summary judgment motions on these issues as well.[40] In addition, AGC argues that it was the prevailing party in the case and should have been awarded attorney's fees. We affirm all of the superior court's rulings on these matters.

### 1. The court did not err in denying AGC summary judgment on whether the assignment was a breach of contract.

The statutory provision in dispute between AGC and K & K concerning assignment is AS 45.02.210(b), which states that a contract for sale of goods cannot be assigned if "the assignment would materially change the duty of the other party, increase materially the burden or risk imposed on the other party by the contract, or impair materially the chance of obtaining return performance."[41] AGC contends that the assignment did not materially change anything, since AGC's only duties were to provide a bill of sale when K & K tendered performance and to provide reasonable access so the dredge could be moved, while the only difference for K & K was that it had to tender to Seuffert instead of to AGC.

The evidence certainly supported K & K's contention that the test of AS 45.02.210(b) was met. AGC was aware that Seuffert had a substantially different motive than AGC with respect to the dredge, since Seuffert considered it an asset to be kept for use as a tourist attraction instead of a liability to be eliminated. AGC thus knew that Seuffert had every incentive to burden K & K's performance, which Seuffert did by increasing K & K's costs, delays, and risks. The jury therefore justifiably concluded that AGC's assignment to Seuffert was a breach of contract.[42] The superior court did not err in denying AGC summary judgment on this question.

### 2. There was no novation.

Generally, an assignor remains liable on an assigned contract.[43] AGC argues, however, that it should not be held liable, and that the court erred in failing to grant its summary judgment motion arguing as much, because the agreement between Seuffert and K & K constituted a novation. We disagree.

"A novation is a substituted contract that includes as a party one who was neither the obligor nor the obligee of the

**40.** K & K also challenges Judge Steinkruger's order granting AGC's October 1999 motion to dismiss, a motion that argued both novation and free assignability of the contract. If in granting AGC's motion the court accepted AGC's novation argument, then AGC could not later have been found jointly liable for Seuffert's actions. Since AGC was in fact later found to be jointly liable, it appears that Judge Funk drew AGC back into the case. As such, and as AGC maintains, Judge Steinkruger's dismissal of all claims against AGC had no effect on the ultimate outcome. K & K's challenge to the court's grant of AGC's motion to dismiss thus also appears to be moot.

**41.** AS 45.02.210(b) states:

Unless otherwise agreed, all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other party, increase materially the burden or risk imposed on the other party by the contract, or impair materially the chance of obtaining return performance. A right to

damages for breach of the whole contract or a right arising out of the assignor's due performance of the entire obligation can be assigned despite agreement otherwise.

**42.** K & K also argues that AGC's rejection of its August 7 tender constituted a repudiation of the contract and thus a breach. This is merely a variant of K & K's argument that the assignment was a breach. If the assignment was valid, for example, rejecting the tender would not be a repudiation because K & K should have tendered to Seuffert. K & K essentially admits in its brief the derivative nature of its tender claim: "AGC's rejection of K & K's tender constitutes a breach of contract as a matter of law, because the assignment to Seuffert materially changed the K & K/AGC agreement and therefore constituted a repudiation." Because they are at root the same claim, we address only the assignment argument.

**43.** *Foster v. Cross,* 650 P.2d 406, 410 (Alaska 1982); AS 45.02.210(a).

original duty." [44] As with accord and satisfaction, any breach of a novation provides no right of action on the old duty.[45] A novation must have "all of the essential elements of an original contract and also an intention that the agreement operate as an immediate discharge of the first contract." [46]

 AGC locates the novation not only in the "pipe yard" agreement, but also in K & K and Seuffert's correspondence in August and September 1998 making changes to contract terms such as the performance bond requirement, the obligation to provide a bill of sale within ten days of tender, and the date by which K & K was to remove the dredge equipment and facilities. AGC contends that these were negotiations for substitute performance and that Seuffert and K & K's agreement discharged AGC.

AGC's novation argument fails for the same reason Seuffert's accord and satisfaction argument fails—there was no evidence of intent to supersede the original contract. K & K started dealing with Seuffert only after it received AGC's unequivocal rejection of its tender. K & K characterizes its contacts and compromises with Seuffert as its efforts to mitigate the harm caused by AGC's breach. K & K repeatedly conditioned its dealings with Seuffert and AGC by reserving all its rights.[47]

K & K's actions are consistent with its explanation of doing what it was forced to do once AGC refused to be involved. K & K was merely modifying the contract terms as exigencies dictated. If AGC's argument could stand, then every time a party wrongfully assigned a contract and the other party consequently negotiated with the assignee in an attempt to avoid a total loss, the breaching assignor would be released from liability.

Every attempt to mitigate would become a novation. Such a rule is clearly untenable and undesirable.

**3. The superior court did not abuse its discretion in awarding attorney's fees to K & K instead of to AGC.**

 AGC contends that the court abused its discretion in awarding attorney's fees to K & K as the prevailing party, instead of to AGC. We have "consistently held that both the determination of 'prevailing party' status and the award of costs and fees are committed to the broad discretion of the trial court." [48] We will only interfere with the court's decision if "it is shown that the court abused its discretion by issuing a decision which is arbitrary, capricious, manifestly unreasonable, or which stems from an improper motive." [49]

 We have held that the prevailing party " 'is the one who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not to the extent of the original contention. [The prevailing party] is the one in whose favor the decision or verdict is rendered and the judgment entered.' " [50] The "main issue" between K & K and AGC was the assignment of the contract and AGC's joint liability. Because K & K won on those issues, awarding K & K attorney's fees was well within the superior court's broad discretion. We thus affirm the court's award of fees to K & K.

**F. Seuffert's Cross–Appeal Regarding Damage Calculation, Government Agencies, and Prejudgment Interest Is Without Merit.**

Seuffert's cross-appeal challenges the trial court's denial of his motion for a directed

**44.** *Oaksmith v. Brusich,* 774 P.2d 191, 196 n. 5 (Alaska 1989) (citing RESTATEMENT (SECOND) OF CONTRACTS § 280 (1981)).

**45.** *Id.*

**46.** *Alaska Creamery Prod., Inc. v. Wells,* 373 P.2d 505, 509–10 (Alaska 1962).

**47.** *Cf.* RESTATEMENT (SECOND) OF CONTRACTS § 329(2) (1981) ("If the obligor, with knowledge of such a repudiation [by the assignor], accepts any performance from the assignee without reserving his rights against the assignor, a novation arises by which the duty of the assignor is discharged and a similar duty of the assignee is substituted.").

**48.** *Tobeluk v. Lind,* 589 P.2d 873, 878 (Alaska 1979).

**49.** *Id.*

**50.** *Id.* at 876 (quoting *Buza v. Columbia Lumber Co.,* 395 P.2d 511, 514 (Alaska 1964)).

verdict on K & K's method of proving delay damages, its denial of his motion for summary judgment on K & K's claim of breach of the implied covenant of good faith and fair dealing by contacting government agencies, and the applicability to the camp location and berm claims of the court's order that prejudgment interest shall run on all claims from August 7, 1998. We affirm all of the superior court's rulings on these matters.

### 1. The superior court did not err in denying Seuffert's motion for a directed verdict on K & K's method of proving damages.

The trial court denied Seuffert's motion for a directed verdict on the issue of whether K & K used the disapproved total cost method without meeting the prerequisites for its use. When reviewing the denial of a motion for a directed verdict, we must "determine whether the evidence, when viewed in the light most favorable to the nonmoving party, is such that reasonable persons could not differ in their judgment as to the facts." [51] " 'If there is room for diversity of opinion among reasonable people, the question is one for the jury.' " [52]

The parties dispute whether K & K used the total cost method, which "calculates damages by determining the difference between the actual costs incurred on a project, plus a reasonable amount for profit, and the contract price." [53] We have determined that calculating damages by estimating how long a project should have taken to complete, comparing this to the actual time needed, and multiplying the difference by the cost of labor, equipment, and overhead per unit of time constitutes a modified total cost approach.[54] The essence of the method is a comparison between a party's initial estimates and the actual cost or time of performing the contract.[55] The total cost method is disfavored "because it assumes that the defendant's breach was the cause of all of the extra cost, it assumes plaintiff's bid [or estimate] was accurately computed, and it assumes that plaintiff was not responsible for increases in cost." [56]

The preferred method of calculating damages is the actual cost method, in which each element of extra expense incurred because of the alleged breach is added up for a total claimed amount.[57] Courts have also allowed a jury verdict method of calculating damages, a variant on actual cost, that "allows the contractor to 'present evidence of the cost of additional work to the finder of fact, including any actual cost data, accounting records, estimates by law and expert witnesses, and calculations from similar projects.' " [58] The jury verdict method basically reflects the principle that "a contractor need not prove damages with mathematical precision, but may only recover those damages which it proves with reasonable certainty." [59]

Seuffert contends that K & K relied exclusively on the total cost method. He claims that K & K's accountant arrived at K & K's damages figures as follows: (1) he identified nineteen line items or cost areas incurred by K & K during the whole project, such as payroll, equipment use fees, and fuel; (2) he figured K & K's total expenses for each line item from information provided by K & K; (3) after minor adjustments, he totaled the nineteen line items to arrive at a total cost for the project of $560,837; (4) he allocated each line item into either a ten-day or twen-

51. *Ben Lomond, Inc. v. Schwartz,* 915 P.2d 632, 635 (Alaska 1996).

52. *Sherbahn v. Kerkove,* 987 P.2d 195, 198 (Alaska 1999) (quoting *Petersen v. Mutual Life Ins. Co.,* 803 P.2d 406, 410 (Alaska 1990)) (alteration omitted).

53. *Geolar, Inc. v. Gilbert/Commonwealth,* 874 P.2d 937, 943 (Alaska 1994).

54. *Id.* at 943–44.

55. *Id.* at 944.

56. *Power Constructors, Inc. v. Taylor & Hintze,* 960 P.2d 20, 41 (Alaska 1998) (quotation omitted).

57. *Anchorage v. Frank Coluccio Constr. Co.,* 826 P.2d 316, 325 (Alaska 1992).

58. *Id.* (quoting *New Pueblo Constructors, Inc. v. State,* 144 Ariz. 95, 696 P.2d 185, 194 (1985)) (alteration omitted).

59. *Id.* at 325 n. 12 (quotation and alteration omitted).

ty-day category, with the former being the project duration estimate and the latter being the assumed delay; and (5) he concluded that $213,840 should be allocated to the ten-day category and $346,997 to the twenty-day. Seuffert says this amounts to an arbitrary allocation of one-third of the total project costs to the ten-day category and two-thirds to the twenty-day category. Seuffert claims that K & K's accountant "arbitrarily" allocated one-third of the costs for payroll, cell phone, consulting, equipment use, fuel and oil, meals, and office expense to the ten-day estimate and two-thirds to the twenty-day delay. Seuffert maintains that K & K thus used the total cost method, just substituting time for costs and relying on an estimated time instead of an original bid.

K & K counters that it gave evidence of its actual costs. Karl testified as to how much time K & K spent excavating a pit, the added equipment needed, the equipment damaged, and the delays incurred—which allegedly would have been unnecessary if Seuffert's camp was not blocking the easiest route for moving the dredge. Karl testified that Seuffert's contact with government agencies delayed the start of the project by thirty days. He testified as to how many days it did take and should have taken to get the dredge out of the pit and on level ground; how many days it took to move the dredge from the pit to its final destination, how many of those days were because of Seuffert's on-site demands and how many were due to the freezing temperatures that K & K would not have had to face if Seuffert had not delayed the start of the project; and how many days it took to build a new ramp up to the highway in order to avoid the parking lot across which Ingrid Seuffert objected to moving the dredge. Karl testified about the extra labor, equipment costs, and delays incurred because of Seuffert's alleged interference. K &

K thus maintains that it specifically identified the added equipment it needed and the hourly rates for their use, as well as its daily costs to maintain a crew and equipment in Chicken. K & K claims that back-up invoices and time records for the labor costs were in the courtroom and available. K & K thus concludes that its claim was based on its actual additional costs, identified and itemized, not on "total cost."

K & K's method resembles a modified total cost approach.[60] On the other hand, K & K offered summaries, exhibits, and testimony concerning delays and costs, and it offered testimony about Seuffert's actions and their ramifications. Thus, K & K's damages claim "cannot be dismissed as a mere total cost case."[61] The court's denial of Seuffert's motion for a directed verdict was therefore proper, and Jury Instruction No. 34, discussed above, provided accurate information on both the actual and total cost methods. That instruction listed the four-part total cost prerequisite test we identified in *Anchorage v. Frank Coluccio Construction Co.*[62] The jury could thus determine what method it thought K & K used and assess damages accordingly. Jury Instruction No. 34 took care of Seuffert's concern.

2. **The superior court did not err in denying all parties summary judgment on K & K's claims that Seuffert's contacts with government agencies constituted a breach of contract.**

K & K alleges that the superior court erred in denying K & K's motion for summary judgment on its claim that Seuffert's contact with the Army Corps of Engineers and with the Department of Natural Resources constituted a breach of the implied covenant of good faith and fair dealing.[63] In his cross-appeal, Seuffert argues that he was

60. See *Geolar*, 874 P.2d at 944.

61. *Power Constructors*, 960 P.2d at 43.

62. 826 P.2d 316, 325 (Alaska 1992) (holding that acceptability of total cost method "hinges on proof that: (1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was

realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses") (quotation omitted).

63. Because the jury justifiably ruled for K & K on these issues, its argument that the trial court erred in denying it summary judgment is moot. *Fairbanks N. Star Borough v. Lakeview Enters.*, 897 P.2d 47, 59 n. 21 (Alaska 1995).

entitled under the *Noerr–Pennington* doctrine to petition government agencies without fear of liability for breach of contract.

■ The *Noerr–Pennington* doctrine evolved out of two United States Supreme Court cases in which the Court held that those who attempt to influence legislative and executive officials are immune from antitrust liability.[64] The Court later extended the doctrine to include attempts to influence adjudicatory proceedings before the courts and administrative agencies.[65] Seuffert argues that the doctrine should be extended to protect a party from liability for contacting agencies to ensure that a contractor performing work on his land does so lawfully. Although we note that Seuffert was not attempting to influence any proceeding or process, we decline to decide if *Noerr–Pennington* should be extended to cover this case.[66]

■ Seuffert was not entitled to summary judgment because genuine issues of material fact existed concerning the reasonableness of and motives behind his contacts with government agencies. Seuffert claims that he had genuine concerns about his own liability and was not trying to block K & K's dredge removal through agency involvement. K & K claims that Seuffert intended to interfere with and thwart K & K's dredge removal efforts. When viewing Seuffert's contacts through the lens of his entire history of conduct, it is clear that genuine issues existed to support the court's denials of summary judgment.

### 3. The court did not err in its award of prejudgment interest.

■ The superior court ordered that prejudgment interest on all claims accrue from

August 7, 1998, when K & K sent a letter that included a threat of litigation. Seuffert's cross-appeal challenges that date as it applies to the claims relating to Seuffert's placement of his camp and the dirt berm, arguing that those claims did not arise until September 12, 1998, when K & K arrived in Chicken to start moving the dredge, because prior to that K & K suffered no injury.

■ "When prejudgment interest begins to accrue is a question of law which we review applying our independent judgment."[67] Alaska Statute 09.30.070(b) states that prejudgment interest accrues from the day process is served on the defendant or the day the defendant received written notice that an injury occurred and that a claim might be brought for that injury. This statute applies "only to actions for personal injury, death, or damage to property, and does not apply to claims for purely economic loss."[68] Rather, in contract cases, prejudgment interest runs from the date the claim accrues, unless that would result in an injustice.[69] We cannot say that the date set by the superior court was incorrect as a matter of law.

■ "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."[70] Given the jury's conclusions, Seuffert's breaching conduct apparently began well before September 12. Seuffert engaged in a continuous course of conduct to impede K & K's performance of the contract starting at least in the summer of 1998, when he relocated his camp and blocked the access road with a berm. These actions constituted

64. *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136–38, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 669–70, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *see also Gunderson v. Univ. of Alaska, Fairbanks*, 902 P.2d 323, 326 (Alaska 1995) (explaining evolution of *Noerr–Pennington* doctrine).

65. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

66. The applicability of a legal doctrine is a question of law to which we apply our independent

judgment, adopting the rule of law that is most persuasive in light of precedent, reason, and policy. *Robles v. Shoreside Petroleum, Inc.*, 29 P.3d 838, 841 (Alaska 2001).

67. *Beaux v. Jacob*, 30 P.3d 90, 100 (Alaska 2001).

68. *Id.*

69. *Rice v. Denley*, 944 P.2d 497, 501 (Alaska 1997).

70. AS 45.02.725(b).

a breach of the covenant of good faith and fair dealing, even if K & K had not yet incurred damages from that breach. A contract cause of action usually accrues at "the time of the breach of the agreement, rather than the time that actual damages are sustained as a consequence of the breach." [71] The superior court need not have recalculated interest from the date of each impediment Seuffert placed before K & K.[72] As a continuing course of conduct, the court could have accrued interest from as early as June 1998. However, Seuffert only challenges the date as being too early, not too late. Accordingly, we affirm the superior court's selection of the date from which to accrue prejudgment interest as August 7, 1998.

## IV. CONCLUSION

We REVERSE the superior court's grant of summary judgment to Seuffert on the issue of the equipment and facilities in the Old Town and REMAND for further proceedings. We AFFIRM all the other challenged rulings.

---

71. *Howarth v. First Nat'l Bank of Anchorage,* 540 P.2d 486, 490–91 (Alaska 1975); *see also Morris v. Morris,* 724 P.2d 527, 529 (Alaska 1986) ("In contract actions, rights to prejudgment interest generally arise on the date of breach. In tort actions, they arise on the date of injury.").

72. This case is unlike those involving maintenance contracts or other contracts that require a series of separate performances over time, for which separate claims accrue as each payment or performance becomes due. *See, e.g., H.J. Tucker & Assoc., Inc. v. Allied Chucker & Eng'g Co.,* 234 Mich.App. 550, 595 N.W.2d 176, 183 (1999); *C–B Realty & Trading Corp. v. Chicago & N.W. Ry. Co.,* 289 Ill.App.3d 892, 225 Ill.Dec. 59, 682 N.E.2d 1136, 1140 (1997); 9 Arthur Linton Corbin, Corbin on Contracts § 956 (interim ed.2002).